PRESENT:  All the Justices

MARK ERIC LAWLOR

                                        OPINION BY
v.   Record No. 120481        JUSTICE WILLIAM C. MIMS
                                      January 10, 2013
COMMONWEALTH OF VIRGINIA

              FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                      Jonathan C. Thacher, Judge

     In this appeal, we review convictions for capital murder

and the imposition of two sentences of death.  We consider

whether the circuit court erred when it (a) limited questioning

during voir dire, (b) excluded evidence during the penalty

phase of trial, and (c) instructed the jury.  We review the

sufficiency of the evidence to prove the elements of the

offenses charged and the aggravating factors required for

imposition of a sentence of death.  We also consider challenges

to the imposition of the death penalty on constitutional and

statutory grounds.  Finally, as required by Code § 17.1-313(C),

we consider whether the sentences of death were imposed under

the influence of passion, prejudice or any other arbitrary

factor and whether the sentences of death are excessive or

disproportionate to the penalty imposed in similar cases,

considering both the crime and the defendant.

         I.   BACKGROUND AND MATERIAL PROCEEDINGS BELOW

     Mark Eric Lawlor was indicted on and convicted of one

count of capital murder in the commission of, or subsequent to,

rape or attempted rape, in violation of Code § 18.2-31(5), and one count of capital murder in the commission of abduction with the intent to defile, in violation of Code § 18.2-31(1).

The victim, Genevieve Orange, was found on the floor of the living area of her studio apartment. She was naked from the waist down, her bra and t-shirt had been pushed up over her breasts, and semen was smeared on her abdomen and right thigh. Her soiled and bloodied shorts and underpants had been flung to the floor nearby. She had been struck 47 times with one or more blunt objects.

A bent metal pot was found near Orange's body. Its wooden handle had broken off and was found in the kitchen sink, near a bloody metal frying pan that had been battered out of its original shape. Some of Orange's wounds were consistent with having been struck with the frying pan.[1] Subsequent medical examination established that she had aspirated blood and sustained defensive wounds, together indicating that she had been alive and conscious during some part of the beating.

Lawlor resided in Orange's apartment building. He also worked there as a leasing consultant and had access to keys to each apartment. On the eve of trial, Lawlor admitted "participation" in the murder.

---

[1] Other wounds may have been consistent with having been struck by a hammer but no hammer was recovered.

2

A blood sample from Orange's body and a buccal swab from Lawlor resulted in the compilation of a polymerase chain reaction ("PCR") DNA profile for each person, consisting of type characteristics or alleles from 16 genetic regions on their respective DNA strands.  Police and medical personnel also collected forensic evidence from Orange's body.  This forensic material, the wooden pot handle, and the frying pan were subjected to DNA analysis resulting in the compilation of a PCR DNA profile for each sample.  A comparison of the PCR DNA profiles revealed that every allele at each of the 16 genetic regions from the forensic material and the frying pan was consistent with either Orange or Lawlor, with one exception: DNA from a non-sperm sample recovered from Orange's abdomen included a fractional amount of a single allele that was not consistent with either person's DNA profile.  However, each of the alleles at the 15 other genetic regions in the sample was attributable to either Orange or Lawlor, as was each of the alleles at all 16 genetic regions from the other forensic material and the frying pan.  The statistical probability that an unrelated person other than Lawlor contributed the DNA foreign to Orange was 1 in more than 6.5 billion.

After Lawlor's conviction during the guilt phase of trial, the jury proceeded to the penalty phase.  The Commonwealth presented its evidence of aggravating factors as required by

Code § 19.2-264.4(C). Lawlor presented rebuttal evidence and evidence of mitigating factors pursuant to Code § 19.2-264.4(B). Over his objection, the court excluded some of his evidence. At the conclusion of the evidence, the court instructed the jury after rejecting some of Lawlor's proffered instructions. The jury found both the vileness and future dangerousness aggravating factors and returned a sentence of death on each count. After denying Lawlor's post-trial motions, the court imposed the jury's sentences.

Lawlor timely filed 217 assignments of error pursuant to Rule 5:22(c) and Code § 19.2-320. We consider his appeal and review the sentences of death pursuant to Code § 17.1-313.

## II. ANALYSIS

Of the 217 assignments of error Lawlor originally filed, 96 are neither listed nor argued in his opening brief and therefore are abandoned under Rule 5:27(c) and (d).[2] Prieto v. Commonwealth, 283 Va. 149, 159, 721 S.E.2d 484, 490-91, cert. denied, ___ U.S. ___, 133 S.Ct. 244, 2012 U.S. Lexis 6641 (2012) ("Prieto II"); Andrews v. Commonwealth, 280 Va. 231,

---

[2] The abandoned assignments of error are 1, 3, 5, 6, 9, 10, 11, 12, 15, 16, 17, 18, 19, 21, 22, 23, 24, 25, 26, 28, 30, 32, 33, 36, 37, 43, 65, 66, 68, 69, 70, 71, 73, 92, 94, 99, 100, 101, 102, 104, 105, 106, 107, 108, 109, 110, 112, 118, 121, 122, 126, 127, 129, 130, 133, 138, 139, 140, 142, 143, 144, 150, 151, 152, 153, 154, 155, 157, 158, 159, 161, 163, 166, 169, 170, 171, 172, 173, 174, 175, 176, 178, 181, 182, 183, 184, 191, 192, 197, 201, 203, 205, 211, 212, 216, and 217.

252, 699 S.E.2d 237, 249, <u>cert. denied</u>, ___ U.S. ___, 131 S.Ct. 299 (2010).  Lawlor aggregates the remaining 121 assignments of error into 18 claims, which we will review chronologically based upon when the core of the alleged error in each claim occurred during the course of the proceedings.

## A. PRETRIAL PROCEEDINGS

### CLAIM 4: EXCLUSION OF QUESTIONS DURING VOIR DIRE

This claim consists of 38 assignments of error asserting that the circuit court improperly limited Lawlor's questioning of 19 members of the jury venire during voir dire, and therefore erred by seating the 12 jurors and 2 alternates.[3]  Of these, assignments of error 38, 40, 41, 42, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, and 58 each merely state that the court erred generally in limiting Lawlor's questioning of specified members of the venire, providing no basis for the asserted error.  Similarly, assignment of error 31 asserts that the court erred by limiting voir dire by excluding unspecified "life qualification" questions and assignment of error 67 asserts the court erred by seating the 14 jurors and alternates "without first ensuring their legal qualification to sit on a

---

[3] One of these, assignment of error 79, asserts that the court erred by denying Lawlor the follow-up question "And what would it depend on, ma'am?" when the member of the venire answered that her decision to impose the death penalty would "depend on the evidence."  We find no argument for this assignment of error in Lawlor's brief and it therefore is abandoned.  Rule 5:27(d).

capital jury." These 21 general assertions are amplified by 16 assignments of error setting forth the questions he was not permitted to ask or information he sought to elicit and the members of the venire to whom the questions were or would have been propounded. The 21 general assignments of error are not independently argued on brief so to the extent they are not encompassed by our review of the 16 specific assignments of error, we will not consider them.[4] Rule 5:27(d).

## 1. STANDARD OF REVIEW

"The purpose of standards of review is to focus reviewing courts upon their proper role when passing on the conduct of other decisionmakers." Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 320 (4th Cir. 2008). Therefore it is incumbent upon the parties and the appellate court to correctly identify and apply them.

Lawlor has incorrectly identified the standard of review applicable to this issue. Citing Nelson v. Commonwealth, 281 Va. 212, 215, 707 S.E.2d 815, 816 (2011), he contends that whether a defendant's right to voir dire the jury was infringed is a mixed question of law and fact reviewed de novo. However, the sole issue in Nelson was sufficiency of the evidence to

---

[4] The brief also contains no independent argument on assignment of error 76 so to the extent it is not encompassed by assignments of error 74 and 75, it too is abandoned. Rule 5:27(d).

6

establish a conviction for driving while intoxicated, in violation of Code § 18.2-266. Id. Although Nelson was tried by jury, id. at 214, 707 S.E.2d at 815, voir dire was not an issue in the appeal.

In prior cases, we have stated that a ruling on a motion to exclude a juror for cause is reviewed as a mixed question of law and fact. LeVasseur v. Commonwealth, 225 Va. 564, 584, 304 S.E.2d 644, 654-55 (1983), cert. denied, 464 U.S. 1063 (1984); Briley v. Commonwealth, 222 Va. 180, 185, 279 S.E.2d 151, 154 (1981). But see Townsend v. Commonwealth, 270 Va. 325, 329, 619 S.E.2d 71, 73 (2005) (applying abuse of discretion standard); Powell v. Commonwealth, 261 Va. 512, 536, 552 S.E.2d 344, 358 (2001) ("Powell I") (same); Burns v. Commonwealth, 261 Va. 307, 329-30, 541 S.E.2d 872, 887, cert. denied, 534 U.S. 1043 (2001) (trial court's decision "will not be reversed on appeal absent a 'showing of manifest error or abuse of discretion.'" (quoting Mackall v. Commonwealth, 236 Va. 240, 252, 372 S.E.2d 759, 767 (1988)); Yeatts v. Commonwealth, 242 Va. 121, 134, 410 S.E.2d 254, 262 (1991), cert. denied, 503 U.S. 946 (1992) (trial court's decision "will not be disturbed on appeal unless the refusal amounts to manifest error."). However, the conduct of voir dire, not exclusion for cause, is the issue raised here.

7

It is well-established that the manner of conducting voir dire, including the exclusion of questions to the venire, is committed to the trial court's discretion and we review its rulings only for abuse of that discretion.  Thomas v. Commonwealth, 279 Va. 131, 162, 688 S.E.2d 220, 237, cert. denied, ___ U.S. ___, 131 S.Ct. 143 (2010); Juniper v. Commonwealth, 271 Va. 362, 390, 626 S.E.2d 383, 402, cert. denied, 549 U.S. 960 (2006); Orbe v. Commonwealth, 258 Va. 390, 403, 519 S.E.2d 808, 815 (1999), cert. denied, 529 U.S. 1113 (2000) ("Orbe I").

In contrast to the de novo standard of review, "the abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the court does not reverse merely because it would have come to a different result in the first instance."  Evans, 514 F.3d at 322.  Accordingly, "when a decision is discretionary . . . . 'the court has a range of choice, and . . . its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.' "  Landrum v. Chippenham & Johnston-Willis Hosps., Inc., 282 Va. 346, 352, 717 S.E.2d 134, 137 (2011) (quoting Kern v. TXO Production Corp., 738 F.2d 968, 970 (8th Cir. 1984)); see also Evans, 514 F.3d at 322 ("[T]he [abuse of discretion] standard draws a line – or rather, demarcates a region – between the unsupportable and the

8

merely mistaken, between the legal error, disorder of reason, severe lapse of judgment, and procedural failure that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not.").

We recently focused this standard of review by identifying the "three principal ways" by which a court abuses its discretion: "when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment."  Landrum, 282 Va. at 352, 717 S.E.2d at 137 (quoting Kern, 738 F.2d at 970).  Naturally, the law often circumscribes the range of choice available to a court in the exercise of its discretion.  In such cases, "[t]he abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions," id. at 357, 717 S.E.2d at 139 (Millette, J., concurring) (quoting Porter v. Commonwealth, 276 Va. 203, 261, 661 S.E.2d 415, 445 (2008), cert. denied, 556 U.S. 1189 (2009)), because a court also abuses its discretion if it inaccurately ascertains its outermost limits.  Such an error may occur when the court believes it lacks authority it possesses, see id. at 358, 661 S.E.2d at 140 (discussing court's mistaken belief it lacked

authority to supervise courtroom security), when it believes the law requires something it does not, LaCava v. Commonwealth, 283 Va. 465, 472, 722 S.E.2d 838, 841 (2012) (court abused its discretion in denying a motion to extend the deadline for filing a transcript based on a flawed interpretation of Rule 5A:8(a)), or when it fails to fulfill a condition precedent that the law requires, Turner v. Commonwealth, 284 Va. 198, 208, 726 S.E.2d 325, 331 (2012) (court abused its discretion in ruling a witness unavailable for lack of memory when it failed to inquire into the authenticity of his claim as required by precedent). But whether a court possesses or lacks authority, and whether it has correctly identified and fulfilled the legal prerequisites to a discretionary act, are themselves significant factors in its consideration. Therefore, while our abuse of discretion standard of review necessarily must include a review of any legal conclusions made concomitant with a lower court's exercise of discretion, that does not mean abuse of discretion review is partially de novo. See Koon v. United States, 518 U.S. 81, 100 (1996).[5]

---

[5] Lawlor similarly implies a de novo review under the abuse of discretion standard elsewhere in his brief when quoting our statement in Porter and subsequent cases that a court "by definition abuses its discretion when it makes an error of law." 276 Va. at 260, 661 S.E.2d at 445. For the foregoing reasons, this statement was not intended to be a back door through which an appellant may convert abuse of discretion review into de novo review.

10

In the case of voir dire, a trial court's discretion in excluding questions asked of the venire is limited by statute and the United States Constitution.  Code § 8.01-358 establishes a "right to ask [a member of the venire] directly any relevant question to ascertain whether he is related to either party, or has any interest in the cause, or has expressed or formed any opinion, or is sensible of any bias or prejudice therein."  To exclude all such questions would be contrary to the statute, thereby constituting an abuse of discretion.  See Powell v. Commonwealth, 267 Va. 107, 143, 590 S.E.2d 537, 559, cert. denied, 543 U.S. 892 (2004) ("Powell II"); LeVasseur, 225 Va. at 581, 304 S.E.2d at 653.

In a capital case, this inquiry of a prospective juror encompasses questions of whether his "views [on the death penalty] would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  Morgan v. Illinois, 504 U.S. 719, 728 (1992) (quoting Wainwright v. Witt, 469 U.S. 412, 424 (1985)); see also Mackall, 236 Va. at 251, 372 S.E.2d at 766 ("[E]ither party may require prospective jurors to state clearly that whatever view they have of the death penalty will not prevent or substantially impair their performance as jurors in conformity with their oath and the court's instructions.").  But within those perimeters, "[a] party has no right . . . to

11

propound any question he wishes, or to extend voir dire questioning ad infinitum. The court must afford a party a full and fair opportunity to ascertain whether prospective jurors 'stand indifferent in the cause,' but the trial judge retains the discretion to determine when the parties have had sufficient opportunity to do so." LeVasseur, 225 Va. at 581, 304 S.E.2d at 653; accord Thomas, 279 Va. at 162-63, 688 S.E.2d at 237; Juniper, 271 Va. at 396, 626 S.E.2d at 405. We therefore review the challenged jurors' entire voir dire, not merely individual statements taken in isolation. Powell I, 261 Va. at 536, 552 S.E.2d at 358; Burns, 261 Va. at 329, 541 S.E.2d at 887.

### 2. VIEWS ON CAPITAL PUNISHMENT

In assignments of error 77, 78, and 88, Lawlor asserts that the court erred by preventing him from asking specific members of the venire "[D]o you have strong feelings in favor of the death penalty?" or "[W]hat are your views about the death penalty?" Lawlor asserts that the Supreme Court of the United States identified such questions as constitutionally protected in Morgan. That assertion is not accurate. Rather, in Morgan the Supreme Court merely reiterated its earlier holding in Witt, 469 U.S. at 424, and Adams v. Texas, 448 U.S. 38, 45 (1980), that a potential juror may be questioned to determine whether his views "would prevent or substantially

12

impair the performance of his duties as a juror in accordance with his instructions and his oath." 504 U.S. at 728 (internal quotation marks omitted). Thus there is no statutory or constitutional right to ask Lawlor's questions. Cf. Code § 8.01-358.

Accordingly, we have held that a party is not entitled to ask potential jurors their views on the death penalty. Burns, 261 Va. at 329, 541 S.E.2d at 887 (citing Mackall, 236 Va. at 251, 372 S.E.2d at 766). The relevant inquiry is whether the juror would adhere to them in disregard of the jury instructions and in violation of his or her oath. Witt, 469 U.S. at 420 ("[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." (quoting Adams, 448 U.S. at 45) (emphasis in Witt)). The court therefore did not abuse its discretion by excluding Lawlor's questions.

### 3. MITIGATING EVIDENCE

In assignments of error 74, 75, 76, 80, 83, 84, 85, and 86, Lawlor argues that the court erred by preventing him from asking specific members of the venire whether they would consider specific types of evidence as mitigating evidence, including evidence that the defendant was under the influence

13

of extreme mental or emotional disturbance; evidence of childhood neglect; evidence of the defendant's full life history; evidence of a lack of prior violent criminal record; and evidence of drug or alcohol use.  Citing Abdul-Kabir v. Quarterman, 550 U.S. 233 (2007), he argues that by denying him the opportunity to ask about specific types of mitigating evidence, the court prevented him from determining whether the jurors could give meaningful consideration to all mitigating evidence.

However, Abdul-Kabir requires that juries consider all mitigating evidence as a whole; it does not require courts to permit defendants to ask jurors how they would weigh every species of mitigating evidence.  See id. at 246.  Furthermore, we have ruled that questions about the effect of specific mitigating evidence on the jurors' deliberations "are improper in voir dire because they are not relevant to a determination of whether a juror has a particular bias or prejudice, but instead attempt to elicit the juror's views on specific types of evidence."  Powell I, 261 Va. at 536, 552 S.E.2d at 358. Accordingly, the court did not abuse its discretion by prohibiting this line of questioning.

In assignment of error 81, Lawlor argues that the court erred by preventing him from asking whether specific members of the venire would consider a life sentence in the absence of any

14

mitigating evidence.  While we have indicated that a defendant need not present any evidence pertaining to sentencing, see Jackson v. Commonwealth, 267 Va. 178, 194, 590 S.E.2d 520, 529, cert. denied, 543 U.S. 891 (2004), each of the specified members of the venire was instructed during voir dire that a sentence of death is never mandatory and that the jury could return a sentence of life imprisonment without parole even if the Commonwealth proved both aggravating factors and Lawlor presented no mitigating evidence.  The court thereafter asked each member whether he or she understood that the defense was not required to present mitigating evidence.  Counsel also asked whether the members of the venire understood and received affirmative responses.  However, the court rejected some forms of Lawlor's question and limited his inquiry as repetitive.

Reviewing the entire voir dire of the specified members of the venire, Powell I, 261 Va. at 536, 552 S.E.2d at 358; Burns, 261 Va. at 329, 541 S.E.2d at 887, we are satisfied that "[t]he circuit court explained the relevant legal principles, asked appropriate questions to ensure that the jurors understood those principles and could apply them to the case, and afforded [Lawlor] a full and fair opportunity to ascertain whether jurors could stand indifferent in the cause."  Bell v. Commonwealth, 264 Va. 172, 196-97, 563 S.E.2d 695, 711-12 (2002), cert. denied, 537 U.S. 1123 (2003) (internal quotation

15

marks omitted).  While the court restricted his voir dire, Lawlor elicited the information he sought and was not entitled to ask the members of the venire this question repetitively or in his preferred form.  Thomas, 279 Va. at 162-63, 688 S.E.2d at 237; Juniper, 271 Va. at 396, 626 S.E.2d at 405; see also Green v. Commonwealth, 266 Va. 81, 97, 580 S.E.2d 834, 843 (2003), cert. denied, 540 U.S. 1194 (2004) ("When . . . a trial court affords ample opportunity to counsel to ask relevant questions . . . sufficient to preserve a defendant's right to trial by a fair and impartial jury, we will generally not reverse [its] decision to limit or disallow certain questions from defense counsel." (internal quotation marks omitted)).  Accordingly, the court did not abuse its discretion.

In assignment of error 87, Lawlor asserts that the court erred by preventing him from asking specific members of the venire if they were substantially impaired from considering a sentence of life imprisonment without parole if the defense presented no mitigating evidence.  He argues that the court properly allowed him to ask whether they were "prevented" from considering life imprisonment without parole but improperly prevented him from asking whether they were "substantially impaired" from considering such a sentence.  He argues that "prevent" and "substantially impair" are not interchangeable.

16

As noted above, the terms "prevent" and "substantially impair" come from Adams, 448 U.S. at 45, and have been reiterated in Witt, 469 U.S. at 424, Morgan, 504 U.S. at 728, and Mackall, 236 Va. at 251, 372 S.E.2d at 766--all cases applying them to a juror's views on capital punishment and their effect on his or her ability to follow jury instructions and fulfill his or her oath. We need not decide whether the terms "prevent" and "substantially impair" are interchangeable in that context because they were not used for that purpose in the portion of the record relevant to this assignment of error. Rather, Lawlor asked a member of the venire, "[D]o you think you would be substantially impaired from considering life without parole as punishment for the guilty capital murderer where aggravating circumstances were found and you heard no evidence of mitigation?"[6] The question therefore did not seek to elicit the effect of the jurors' views on capital punishment but rather whether they would consider life imprisonment without parole if Lawlor presented no mitigating evidence, which, as noted above, they had already answered.[7] That was the view of the circuit court as well: in excluding the question

_____

[6] Lawlor also proposed a similar but longer version of the question in written form.

[7] This assignment of error names two additional members of the venire who were not specified in assignment of error 81. However, they too had been fully instructed that the defendant need not present any mitigating evidence and were questioned whether they understood by the court and counsel.

17

upon the Commonwealth's objection, it ruled, "They have answered that question about eight times.  Each of the prospective jurors have said [']I would consider both, whether there was mitigating evidence or where there wasn't mitigating evidence['] and you continue to ask the question."

As noted above, a defendant has a right to propound questions relevant under Code § 8.01-358 and the Adams line of cases.  However, he is not entitled to his preferred form of question and does not have the right to repeat them cumulatively when he already has elicited the relevant information.  Thomas, 279 Va. at 162-63, 688 S.E.2d at 237; Juniper, 271 Va. at 396, 626 S.E.2d at 405; Green, 266 Va. at 97, 580 S.E.2d at 843.  The information Lawlor sought was whether the jurors would consider life imprisonment without parole in the absence of any mitigating evidence.  Any distinction between the terms "prevent" and "substantially impair" in the Adams line of cases does not apply to this particular inquiry.  Therefore, he had obtained the relevant information and the court did not abuse its discretion by restricting the form or frequency of his questions.

### 4. PRISON CONDITIONS

In assignment of error 72, Lawlor argues that the court erred by preventing him from asking potential jurors whether they could consider a sentence of life imprisonment without

18

parole in the absence of any evidence of prison security.  He contends that jurors may have been more willing to sentence him to life imprisonment without parole if they were confident he would be unable to present a danger there or escape.

We have previously ruled that evidence of general prison conditions is not relevant in a capital case, either as mitigating evidence, Juniper, 271 Va. at 425, 626 S.E.2d at 423 (citing Cherrix v. Commonwealth, 257 Va. 292, 310, 513 S.E.2d 642, 653, cert. denied, 528 U.S. 873 (1999)), or to rebut the future dangerousness aggravating factor.  Id. at 426-27, 626 S.E.2d at 424 (citing Bell, 264 Va. at 201, 563 S.E. 2d at 714); see also Morva v. Commonwealth, 278 Va. 329, 350, 683 S.E.2d 553, 565 (2009), cert. denied, ___ U.S. ___, 131 S.Ct. 97 (2010) ("The generalized competence of the Commonwealth to completely secure a defendant in the future is not a relevant inquiry.").  Code § 8.01-358 does not entitle or permit the court or a party to examine potential jurors to ascertain what effect the exclusion of irrelevant evidence may have on their deliberations.  Accordingly, the court did not abuse its discretion by excluding Lawlor's question.

### 5. MOTION FOR A MISTRIAL

In assignments of error 59 and 61, Lawlor argues that the court failed to remedy its erroneous restrictions on voir dire by denying his motion to re-question 7 members of the venire

19

and by denying his alternative motion for a mistrial.  Because we have found that the court did not erroneously restrict voir dire, the court did not err in denying the motion.[8]

CLAIM 5: THE CIRCUIT COURT'S CONDUCT DURING VOIR DIRE

This claim consists of 10 assignments of error asserting that the circuit court erred by engaging in prejudicial conduct during voir dire.

Lawlor asserts in assignments of error 34, 77, and 82 that the court engaged in prejudicial conduct during voir dire by issuing contradictory rulings.  Based on our review of the places in the record to which Lawlor refers, see Rule 5:27(c) (requiring an appellant to refer "to the pages of the appendix where the alleged error has been preserved"), the only rulings adverse to Lawlor were those we have refused to reverse under the abuse of discretion standard, including rulings on questions to elicit the jurors' views or feelings on capital punishment, their ability to consider a sentence of life imprisonment without parole in the absence of mitigating evidence, and their willingness to consider specific types of mitigating evidence.  Because those rulings were not error,

---

[8] These assignments of error include four members of the venire not specified in assignments of error 81 and 87.  However, each of these members had also been instructed by the court that the defendant need not present any mitigating evidence and were questioned whether they understood by the court and counsel.  Therefore the reasoning set forth above also applies to them.

they did not prejudice Lawlor in voir dire. To the extent that the adverse rulings may have been contradicted by favorable rulings at other places in the record, the favorable rulings could not prejudice Lawlor because they enabled him to propound questions that the court could properly, in its discretion, have excluded.

Lawlor also argues in assignments of error 35, 39, 60, 89, 90, and 91 that he was prejudiced by the court's reprimands in the presence of jurors, either in open court or in a loud voice during bench conferences, and in sustaining the Commonwealth's objections to his voir dire questions in the presence of the jury. Based on our review of the places in the record to which Lawlor refers, <u>see</u> Rule 5:27(c), either he did not object that the comments were prejudicial when they were made in open court or there is no indication that the jury heard the comments made during bench conferences.[9] We cannot consider any comments where the record contains no indication that the jury heard

_____

[9] Lawlor did request that the court and counsel keep their voices down in the bench conferences, but there is no indication that the comments he asserts were prejudicial were overheard by the jury. On one occasion, he suggested the possibility they were audible but the court ruled they were not. On another occasion, co-counsel noted that the bench conference could be heard at counsel table and objected to the seating of the members of that panel of the venire. However, the court ruled that counsel had already consented to their qualification and that the objection therefore was untimely. Lawlor has not assigned error to either ruling. Consequently, we will not review them. Rule 5:22(c).

them because there is no basis to find prejudice.  Prince
Seating Corp. v. Rabideau, 275 Va. 468, 470, 659 S.E.2d 305,
307 (2008) (per curiam) ("We cannot review the ruling of a
lower court for error when the appellant does not . . . provide
us with a record that adequately demonstrates that the court
erred.").  We will not consider any comments where Lawlor
failed to object because the issue was not preserved.  Rule
5:25; Porter, 276 Va. at 256, 661 S.E.2d at 442 (noting the
issue of prejudice was not preserved because "the record shows
that he failed to timely object to any of the circuit court's
comments").

In assignment of error 62, Lawlor argues that the court
erred by denying his written motion to reopen voir dire to
permit him to ask additional questions.  In that motion, he
also sought in the alternative a mistrial on the ground that
the court's comments and reprimands could be heard by the jury
and were prejudicial.  In denying the motion, the court stated
that it could only rule on timely objections.

We review denial of a motion for mistrial for abuse of
discretion.  Lewis v. Commonwealth, 269 Va. 209, 213-14, 608
S.E.2d 907, 909 (2005) (citing Burns, 261 Va. at 341, 541
S.E.2d at 894).  The comments and reprimands Lawlor asserted to
be prejudicial in the motion were made during voir dire of the
first nine jurors, which occurred on February 2 and 3, 2011.

22

However, he did not file his motion until February 7. The court denied it then as untimely. That ruling was not an abuse of discretion. See Cheng v. Commonwealth, 240 Va. 26, 40, 393 S.E.2d 599, 607 (1990) (declining to reverse denial of motion for mistrial where the defendant failed to seek corrective action promptly when the allegedly prejudicial comments were made).

CLAIM 6: MISLEADING THE JURY

This claim consists of 2 assignments of error, assignments of error 63 and 64, in which Lawlor asserts that by overruling his objections to the Commonwealth's voir dire questions and sustaining the Commonwealth's objections to his, the circuit court misled the jurors into believing they could disregard mitigating evidence.

Lawlor first argues that the court erred by allowing the Commonwealth to state "[W]hen it comes to mitigating evidence the [c]ourt will instruct you that you shall consider . . . the mitigating evidence? But, again, [as with evidence of aggravating factors,] you don't have to accept it?" However, Lawlor did not object to the statement. We therefore will not consider this argument. Rule 5:25.

Similarly, he argues that the court erred by sustaining the Commonwealth's objection to his question, "Do you all understand that you can't reject any kind of mitigation

23

evidence?" The court sustained the objection as the question was worded. Lawlor then expressly accepted the court's ruling and agreed to move on. We therefore will not consider this argument. Rule 5:25.

Lawlor also refers to a written motion in limine he filed to prevent future statements by the Commonwealth that the jury could reject mitigating evidence. However, the court granted the motion. Lawlor is not aggrieved by a ruling in his favor.

## B. THE GUILT PHASE OF TRIAL

### CLAIM 8: CHALLENGES TO COUNT I (CAPITAL MURDER IN THE COMMISSION OF RAPE OR ATTEMPTED RAPE)

This claim consists of 2 assignments of error relating to the first count of the indictment, challenging rulings on a motion to strike and a motion in limine.

### 1. MOTION TO STRIKE

In assignment of error 93, Lawlor asserts that the court erred by denying his motion to strike the element of rape from Count I of the indictment, capital murder in the commission of or subsequent to rape or attempted rape, in violation of Code § 18.2-31(5). Citing Moore v. Commonwealth, 254 Va. 184, 186, 491 S.E.2d 739, 740 (1997), he contends that there was no evidence of penile penetration, an essential element of rape.

Under Code § 18.2-31(5) willful, deliberate, and premeditated killing is capital murder if committed in the

24

commission of or subsequent to either rape or attempted rape.[10] Proof of either predicate is sufficient to establish the crime of capital murder under the statute. Accordingly, the conviction must be affirmed if the evidence is sufficient to prove the statutory crime charged in the indictment, which in this case includes both rape and attempted rape.

While Lawlor's assignment of error asserts that the evidence was insufficient to prove rape, neither it nor any other challenges the sufficiency of the evidence to prove attempted rape. Consequently, the unchallenged attempted rape predicate is a separate and independent basis upon which to affirm his conviction of the statutory crime as charged in the indictment. We therefore do not review the sufficiency of the evidence to prove the separate rape predicate. Johnson v. Commonwealth, 45 Va. App. 113, 116-17, 609 S.E.2d 58, 60 (2005); see also Manchester Oaks Homeowners Ass'n, Inc. v. Batt, 284 Va. 409, 421-22, 732 S.E.2d 690, 698 (2012).

2. MOTION IN LIMINE

In assignment of error 114, Lawlor asserts that allowing the jury to consider the rape predicate during the penalty phase may have been prejudicial because jurors may have viewed

---

[10] Such a killing also is capital murder if committed in the commission of or subsequent to forcible sodomy, attempted forcible sodomy, or object sexual penetration. Code § 18.2-31(5). These predicates were not included in the indictment and are not relevant in this appeal.

25

rape as more reprehensible than attempted rape, thereby influencing them to impose a sentence of death rather than life imprisonment without parole.

Lawlor challenged the sufficiency of the evidence for the rape portion of the charge in his motion to strike. That motion was timely made. However, he did not make this argument regarding prejudice then. Rather, he argued prejudice for the first time in a motion in limine filed after the jury had been instructed in the guilt phase of trial and after it returned its verdict. This prejudice argument was not timely at that stage of the trial.

It is axiomatic that when a jury considers what sentence to impose upon a defendant convicted of a crime, the charge upon which he stands convicted is essential to its deliberation. Both Code § 19.2-295(A) and Code § 19.2-264.3(C) direct that the same jury that returned a conviction shall thereafter determine the sentence to be imposed. The statutes therefore presume that the jury is cognizant of the conviction during its deliberation of the sentence. Further, Code §§ 18.2-10, 18.2-11, 18.2-12, and 18.2-13 set forth the permissible ranges of sentences that juries may impose based upon the offense for which the defendant stands convicted, either directly or as a result of the classification of the

offense.  Thus it is by knowing the offense that the jury knows the legal range for the sentence.

Consequently, the charge upon which a defendant stands convicted cannot, as a matter of law, be irrelevant to or prejudicial in the jury's consideration of the sentence to be imposed.[11]  Accordingly, because Lawlor's argument that allowing the jurors to consider the rape predicate would prejudice their penalty phase deliberations was first made after they had convicted him, it was not timely.  It therefore will not be considered.  Rule 5:25.

CLAIM 7: CHALLENGES TO COUNT II (CAPITAL MURDER IN THE COMMISSION OF ABDUCTION WITH INTENT TO DEFILE)

This claim consists of 7 assignments of error relating to the second count of the indictment, challenging rulings on a motion to strike, a motion in limine, and jury instructions.

1. MOTION TO STRIKE

In assignments of error 95 and 96, Lawlor asserts that the court erred by denying his motions to strike the evidence on Count II of the indictment, capital murder in the commission of abduction with the intent to defile, in violation of Code § 18.2-31(1).  Citing Powell I, he contends that there is no

_____

[11] This does not affect those situations wherein the defendant has been convicted on multiple charges based on the same facts, when double jeopardy considerations may compel the Commonwealth to elect which charge to submit to the jury for the imposition of a sentence.  E.g., Andrews, 280 Va. at 287-88 & n.19, 699 S.E.2d at 269-70 & n.19.

27

evidence of an abduction "separate and apart from, and not merely incidental to" capital murder in the commission of rape or attempted rape.

A motion to strike challenges whether the evidence is sufficient to submit the case to the jury. Culpeper Nat'l Bank v. Morris, 168 Va. 379, 384, 191 S.E. 764, 766 (1937). What the elements of the offense are is a question of law that we review de novo. Whether the evidence adduced is sufficient to prove each of those elements is a factual finding, which will not be set aside on appeal unless it is plainly wrong. George v. Commonwealth, 242 Va. 264, 278, 411 S.E.2d 12, 20 (1991), cert. denied, 503 U.S. 973 (1992). In reviewing that factual finding, we consider the evidence in the light most favorable to the Commonwealth and give it the benefit of all reasonable inferences fairly deducible therefrom. Commonwealth v. McNeal, 282 Va. 16, 20, 710 S.E.2d 733, 735 (2011) (citing Noakes v. Commonwealth, 280 Va. 338, 345, 699 S.E.2d 284, 288 (2010)); Muhammad v. Commonwealth, 269 Va. 451, 479, 619 S.E.2d 16, 31 (2005), cert. denied, 547 U.S. 1136 (2006).

> After so viewing the evidence, the question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In sum, if there is evidence to support the conviction, the reviewing court is not permitted to substitute its judgment, even if its view of the evidence might differ from the conclusions reached by the finder of fact at the trial.

McNeal, 282 Va. at 20, 710 S.E.2d at 735 (citations, internal quotation marks, and alterations omitted).

In Scott v. Commonwealth, 228 Va. 519, 323 S.E.2d 572 (1984), we considered the elements of the statutory offense of abduction set forth in Code § 18.2-47.  We determined that statutory abduction, unlike common law abduction, required no proof of asportation.  Rather, the statutory offense is complete upon "the physical detention of a person, with the intent to deprive him of his personal liberty, by force, intimidation, or deception."  Id. at 526, 323 S.E.2d at 577. We recognized that some form of detention is inherent in rape, robbery, and assault but postponed consideration of any potential constitutional problems created by the overlap for a future case where they were squarely presented.  Id.

That case came a year later, in Brown v. Commonwealth, 230 Va. 310, 337 S.E.2d 711 (1985).  We determined that "the General Assembly did not intend to make the kind of restraint which is an intrinsic element of crimes such as rape, robbery, and assault a criminal act, punishable as a separate offense." Id. at 314, 337 S.E.2d at 713.  The test enunciated by the Supreme Court in Blockburger v. United States, 284 U.S. 299, 304 (1932), to ensure that a prosecution does not violate the

double jeopardy clause therefore did not apply.  Brown, 230 Va. at 313-14, 337 S.E.2d at 713-14.  Accordingly,

> one accused of abduction by detention and
> another crime involving restraint of the victim,
> both growing out of a continuing course of
> conduct, is subject upon conviction to separate
> penalties for separate offenses only when the
> detention committed in the act of abduction is
> separate and apart from, and not merely
> incidental to, the restraint employed in the
> commission of the other crime.

Id. at 314, 337 S.E.2d at 713-14.

Lawlor argues that applying the facts of his case to the factors adopted by the Court of Appeals in Hoyt v. Commonwealth, 44 Va. App. 489, 494, 605 S.E.2d 755, 757 (2004), leads to the conclusion that there was no abduction separate and apart from the murder and rape or attempted rape.[12]  We disagree that Hoyt is applicable in this case.

The only issue when abduction is charged alongside an offense for which detention is an intrinsic element is whether

---

[12] According to the Court of Appeals in Hoyt, the " 'four factors . . . central to' determining whether or not an abduction or kidnapping is incidental to another crime" are
> (1) the duration of the detention or
> asportation; (2) whether the detention or
> asportation occurred during the commission of a
> separate offense; (3) whether the detention or
> asportation which occurred is inherent in the
> separate offense; and (4) whether the
> asportation or detention created a significant
> danger to the victim independent of that posed
> by the separate offense.

44 Va. App. at 494, 605 S.E.2d at 757 (quoting Gov't of the V.I. v. Berry, 604 F.2d 221, 227 (3d. Cir. 1979)).

any detention exceeded the minimum necessary to complete the required elements of the other offense.[13]  See Powell I, 261 Va. at 541, 552 S.E.2d at 360 (stating the question is whether "there is sufficient evidence to support the finding of the jury that [the defendant] used greater restraint than was necessary" to commit the other offense.  (emphasis added)).  We already have stated that murder is not a crime for which detention is inherent as an intrinsic element.  Id. at 541 n.11, 552 S.E.2d at 360 n.11.  We therefore need only consider whether the evidence in this case proves detention separate and apart from rape or attempted rape.

Lawlor was neither indicted nor convicted upon a charge of rape.  However, the charge of capital murder in the commission of or subsequent to rape or attempted rape incorporates the statutory definition of rape.  As relevant to this case, the elements of that offense are "sexual intercourse with a complaining witness" "against the complaining witness's will,

---

[13] In Brown and subsequent cases, we have acknowledged some degree of detention to be inherent in rape, robbery, and assault but we have not indicated that any asportation of the victim is similarly inherent.  Cf. Cardwell v. Commonwealth, 248 Va. 501, 511, 450 S.E.2d 146, 153 (1994), cert. denied, 514 U.S. 1097 (1995) ("[T]ransporting [the victim] from the robbery scene was . . . separate and apart from, and not merely incidental to, the robbery and was greater than the restraint intrinsic in a robbery."); Coram v. Commonwealth, 3 Va. App. 623, 626, 352 S.E.2d 532, 534 (1987) ("[A]sportation to decrease the possibility of detection is not an act inherent in or necessary to the restraint required in the commission of attempted rape.").

by force, threat or intimidation." Code § 18.2-61(A). Because intercourse constituting rape necessarily occurs against the victim's will, we presume that the victim was present only because the offender "deprive[d her] of [her] personal liberty" to escape. Scott, 228 Va. at 526, 323 S.E.2d at 576. Thus the restraint necessary to prevent such escape is an intrinsic element of the offense. But additional restraint, either as to duration or degree, is not inherent in rape and therefore is not an intrinsic element. See Brown, 230 Va. at 314, 337 S.E.2d at 714 (considering both the "time and distance" between the abduction and other offense and the "quality and quantity" of the force and intimidation used to effectuate the abduction and other offense).

For example, in Hoke v. Commonwealth, 237 Va. 303, 311, 377 S.E.2d 595, 600, cert. denied, 491 U.S. 910 (1989), the victims' "wrists and ankles were bound securely with ligatures, her mouth was gagged tightly, and she was detained for a lengthy period." We determined that this was sufficient to establish a detention beyond that necessary to complete the separate offenses of robbery and rape. Similarly, in Fields v. Commonwealth, 48 Va. App. 393, 400, 632 S.E.2d 8, 11 (2006), the defendant "twice choked [the victim] to the point of unconsciousness." The choking increased the risk of death and injury beyond the rape itself and deprived the victim of the

32

opportunity to resist or call for help in ways not intrinsically encompassed by rape alone.  Id.

This case is similar to Fields.  Rendering one's victim unconscious is not an essential, intrinsic element to complete the offense of rape.  The evidence adduced at trial, viewed in the light most favorable to the Commonwealth, established that Orange was beaten 47 times with a blunt object, and she was conscious and alive for part of the beating.  This manner of effectuating a capital murder in the commission of rape or attempted rape is not inherent in the elements of those crimes. The evidence therefore is sufficient to establish capital murder in the commission of abduction with intent to defile "separate and apart from, and not merely incidental to," capital murder in the commission of or subsequent to rape or attempted rape.[14]  See Powell I, 261 Va. at 540-41, 552 S.E.2d at 360; Brown, 230 Va. at 314, 337 S.E.2d at 713-14.

### 2. MOTION IN LIMINE

Lawlor also asserts in assignments of error 113, 115, and 116 that the court erred by denying his motion in limine to exclude the conviction for capital murder in the commission of an abduction because it was based on the same operative facts as capital murder in the commission of rape or attempted rape.

---

[14] Having addressed Lawlor's argument on these assignments of error in the context of our own precedents, we express no opinion on the Hoyt factors.

33

He argues that allowing the jury to consider both charges violates the double jeopardy clause.  We review de novo claims that multiple punishments have been imposed for the same offense in violation of the double jeopardy clause.  Fullwood v. Commonwealth, 279 Va. 531, 539, 689 S.E.2d 742, 747 (2010) (citing United States v. Imngren, 98 F.3d 811, 813 (4th Cir. 1996)).

> We previously examined this issue in Brown and Powell I:

> The double jeopardy clause of the Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb. . . ." It is now well recognized that this clause affords an accused three distinct constitutional guarantees. "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense."

Brown, 230 Va. at 312-13, 337 S.E.2d at 712-13 (quoting North Carolina v. Pearce, 395 U.S. 711, 717 (1969)); accord Andrews, 280 Va. at 279, 699 S.E.2d at 264.  "The present case involves the third protection because [Lawlor's] convictions, and the death sentences that resulted, occurred in a single trial." Id. (citing Blythe v. Commonwealth, 222 Va. 722, 725, 284 S.E.2d 796, 797-98 (1981)).

However double jeopardy does not prevent a defendant from suffering separate punishments for separate offenses growing

34

out of the same continuing course of conduct.  So long as abduction "is separate and apart from, and not merely incidental to, the restraint employed in the commission of the other crime" the defendant may be punished for both.  Powell I, 261 Va. at 540-41, 552 S.E.2d at 360; Brown, 230 Va. at 314, 337 S.E.2d at 713-14.  As noted above, the evidence in this case supports convictions for capital murder in the commission of abduction with intent to defile and capital murder in the commission of or subsequent to rape or attempted rape.  The duration and manner of Orange's detention is separate and apart from the detention inherent in capital murder in the commission of rape or attempted rape.  Therefore the conviction and sentence on the charge of capital murder in the commission of abduction with intent to defile do not violate the double jeopardy clause.

## 3. JURY INSTRUCTIONS

In assignments of error 97 and 98, Lawlor asserts that the court erred by failing to instruct the jury that the detention inherent in capital murder in the commission of or subsequent to rape or attempted rape cannot serve as the basis for conviction upon a charge of capital murder in the commission of abduction with intent to defile.  The court refused his proffered instruction that the jury must find "beyond a reasonable doubt[] that any abduction . . . was separate and

35

apart from, and not merely incidental to, the act of rape or attempted rape. The restraint inherent in Count 1 cannot serve as the sole basis for a conviction for Count 2." He argues that in refusing the instruction, the court failed to instruct the jury on a necessary element of the charge.

We review jury instructions "to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." Cooper v. Commonwealth, 277 Va. 377, 381, 673 S.E.2d 185, 187 (2009) (internal quotation marks omitted). This is a mixed question of law and fact. It is error to give an instruction that incorrectly states the law; "whether a jury instruction accurately states the relevant law is a question of law that we review de novo." Orthopedic & Sports Physical Therapy Assocs., Inc. v. Summit Group Props., LLC, 283 Va. 777, 782, 724 S.E.2d 718, 721 (2012) (internal quotation marks omitted); see also Velasquez v. Commonwealth, 276 Va. 326, 330, 661 S.E.2d 454, 456-57 (2008) (finding error when court's instruction was an incorrect statement of law). However, "jury instructions 'are proper only if supported by the evidence,' " Orbe I, 258 Va. at 398, 519 S.E.2d at 813 (quoting Commonwealth v. Donkor, 256 Va. 443, 445, 507 S.E.2d 75, 76 (1998)), and more than a scintilla of evidence is required. Andrews, 280 Va. at 276, 699 S.E.2d at 263; Juniper, 271 Va. at 418, 626 S.E.2d at 419. "When reviewing a trial

36

court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." Commonwealth v. Vaughn, 263 Va. 31, 33, 557 S.E.2d 220, 221 (2002); accord Cooper, 277 Va. at 381, 673 S.E.2d at 187.

A trial court has a duty when instructing the jury to define each element of the relevant offense.[15] Dowdy v. Commonwealth, 220 Va. 114, 116, 255 S.E.2d 506, 508 (1979). However, as noted above, what the elements are is a question of law. See Kozmina v. Commonwealth, 281 Va. 347, 349, 706 S.E.2d 860, 862 (2011); Houston v. Commonwealth, 87 Va. 257, 262, 12 S.E. 385, 386 (1890). Therefore, whether the detention established by the evidence is "the kind of restraint which is an intrinsic element of crimes such as rape, robbery, and assault," Brown, 230 Va. at 314, 337 S.E.2d at 713 (emphasis added), is a question of law to be determined by the court. Fields, 48 Va. App. at 399, 632 S.E.2d at 10. Accordingly, the court did not err in denying the instruction.

CLAIM 12: VOLUNTARY INTOXICATION

This claim consists of a single assignment of error, assignment of error 111, in which Lawlor asserts that the

---

[15] Instructions 6 and 7 set forth the elements of rape and attempted rape. Instruction 12 set forth the elements of abduction with intent to defile. These instructions were granted.

37

circuit court erred by excluding Charles Wakefield's testimony during the guilt phase of trial. He proffered that Wakefield would have testified that Lawlor drank, bought liquor, and often smelled of alcohol during the three weeks preceding the murder. The court ruled that evidence of general alcohol abuse may be relevant as mitigation during the penalty phase but was irrelevant and therefore inadmissible in the guilt phase. Lawlor argues that the court's ruling was error because he sought to establish that he was voluntarily intoxicated at the time of the offense and therefore incapable of forming the requisite intent to commit capital murder.

A ruling that evidence is inadmissible is reviewed for abuse of discretion. Thomas, 279 Va. at 168, 688 S.E.2d at 240; Commonwealth v. Wynn, 277 Va. 92, 97, 671 S.E.2d 137, 139 (2009). "[E]vidence of collateral facts and facts incapable of supporting an inference on the issue presented are irrelevant and cannot be accepted in evidence. Such irrelevant evidence tends to draw the jurors' attention toward immaterial matters" and therefore is properly excluded. Coe v. Commonwealth, 231 Va. 83, 87, 340 S.E.2d 820, 823 (1986).

We have said that "[a] person who voluntarily has become so intoxicated as to be unable to deliberate and premeditate cannot commit any class of murder that is defined as a wilful, deliberate and premeditated killing." Giarratano v.

*Commonwealth*, 220 Va. 1064, 1073, 266 S.E.2d 94, 99 (1980) (citing *Hatcher v. Commonwealth*, 218 Va. 811, 814, 241 S.E.2d 756, 758 (1978)); *accord* *Essex v. Commonwealth*, 228 Va. 273, 281, 322 S.E.2d 216, 220 (1984).  However, proof of mere intoxication is insufficient; the defendant must establish intoxication so great it rendered him incapable of premeditation.  *Giarratano*, 220 Va. at 1073, 266 S.E.2d at 99. Consequently, even testimony that the defendant was drinking on the day of the offense is insufficient to establish that he was too intoxicated to form the requisite intent.  *Waye v. Commonwealth*, 219 Va. 683, 698, 251 S.E.2d 202, 211, *cert. denied*, 442 U.S. 924 (1979).  Accordingly, testimony about Lawlor's drinking during the three-week period prior to the murder would not be probative of that issue and it therefore was irrelevant.  The court did not abuse its discretion by excluding it during the guilt phase.

### CLAIM 13: PRINCIPAL IN THE SECOND DEGREE

This claim consists of 3 assignments of error asserting that the circuit court erred by preventing Lawlor from presenting a defense that he was merely a principal in the second degree.

### 1. REQUESTS FOR FUNDING

In assignment of error 27, Lawlor asserts that the court erred by denying his requests for funding for a private

investigator to travel to Uruguay to interview and collect a DNA sample from a third party.  Lawlor similarly asserts in assignment of error 29 that the court erred by denying his request for funds for private mitochondrial DNA testing of hair recovered from Orange's body.  Lawlor argues that these funding requests were necessary to enable him to present a defense on the ground that (a) someone else actually committed the murder, (b) Lawlor was merely a principal in the second degree, and therefore (c) Lawlor was culpable only of first-degree murder rather than capital murder.

Citing Crawford v. Commonwealth, 281 Va. 84, 97, 704 S.E.2d 107, 115 (2011), Lawlor again mistakenly asserts that we review these issues de novo.  However, we did not review any denial of a request for funding in that case.  To the contrary, denial of funding is reviewed for abuse of discretion.  In particular,

> [i]n Husske v. Commonwealth, 252 Va. 203, 476 S.E.2d 920 (1996), this Court noted that an indigent defendant is not constitutionally entitled, at the state's expense, to all the experts that a non-indigent defendant might afford.  Id. at 211, 476 S.E.2d at 925.  All that is required is that an indigent defendant have "'an adequate opportunity to present his claims fairly within the adversary system.'" Id. (quoting Ross v. Moffitt, 417 U.S. 600, 612 (1974)).

> In Husske we held that

40

an indigent defendant who seeks the appointment of an expert witness, at the Commonwealth's expense, must demonstrate that the subject which necessitates the assistance of the expert is "likely to be a significant factor in his defense," and that he will be prejudiced by the lack of expert assistance.

Id. at 211-12, 476 S.E.2d at 925 (citation omitted). In that context, we specified that a defendant seeking the assistance of an expert witness "must show a particularized need" for that assistance. Id.

It is the defendant's burden to demonstrate this "particularized need" by establishing that an expert's services would materially assist him in preparing his defense and that the lack of such assistance would result in a fundamentally unfair trial. Id.; accord Green v. Commonwealth, 266 Va. 81, 92, 580 S.E.2d 834, 840 (2003). We made clear in Husske and subsequent cases that "mere hope or suspicion that favorable evidence is available is not enough to require that such help be provided." 252 Va. at 212, 476 S.E.2d at 925 (internal quotation marks omitted). Whether a defendant has made the required showing of particularized need is a determination that lies within the sound discretion of the trial court. Id. [at 212], 476 S.E.2d at 926; Lenz v. Commonwealth, 261 Va. 451, 462, 544 S.E.2d 299, 305, cert. denied, 534 U.S. 1003 (2001); Bailey v. Commonwealth, 259 Va. 723, 737, 529 S.E.2d 570, 578[, cert. denied, 531 U.S. 995] (2000).

Commonwealth v. Sanchez, 268 Va. 161, 165, 597 S.E.2d 197, 199 (2004) (internal alteration omitted); accord Thomas, 279 Va. at 169-70, 688 S.E.2d at 241. The expert services to which a defendant may be entitled following the required showing of particularized need may include those of a private

41

investigator.  Husske, 252 Va. at 212, 476 S.E.2d at 926;

Bailey, 259 Va. at 737, 529 S.E.2d at 578.

During a December 9, 2010 motions hearing, Lawlor sought

funding to send an investigator to Uruguay.  He argued that he

wanted the investigator to interview and collect a DNA sample

from Rafael Delgado, who lived in Orange's apartment building

at the time of the murder but who thereafter left the country.

Lawlor admitted that he had known of Delgado's existence since

the indictment in March 2009.[16]  Nevertheless, in December 2010

he still did not know where in Uruguay Delgado might be found

and had not asked him whether he would provide a DNA sample.

The court noted that Lawlor had known of Delgado's

existence for nearly two years but had not undertaken any

significant steps to locate him.  It also ruled that it would

not approve funding the investigation until Lawlor had located

Delgado and ascertained that he was willing to provide a DNA

sample.

Lawlor renewed his request at a January 13, 2011 motions

hearing after locating Delgado and ascertaining that he was

willing to speak with the investigator and return to testify at

trial if appropriate.  During that hearing, Lawlor admitted to

participating in Orange's murder.  The court then again noted

---

[16] He had also cited Delgado's presence in Uruguay during a
January 21, 2010 hearing as partial basis for a continuance
when the trial was scheduled for March 1 of that year.

42

that Lawlor had known of Delgado's existence for 22 months but had only obtained the information necessary to justify a request for investigatory funds on the eve of trial. Because Lawlor admitted participation in the murder, he should have known promptly whether there were any potential co-defendants and who those potential co-defendants were. The court then ruled that Lawlor had a right to call Delgado at trial and that it would provide funds to make Delgado available as a defense witness. However, it denied the request for funds to send the investigator to Uruguay.

As noted above, an indigent defendant has the right to an adequate opportunity to present his claims fairly. Sanchez, 268 Va. at 165, 597 S.E.2d at 199. However, he bears the burden of establishing a particularized need for an expert's services – i.e., that the services must "materially assist him in preparing his defense and that the lack of such assistance would result in a fundamentally unfair trial." Id.; Thomas, 279 Va. at 169-70, 688 S.E.2d at 241. The court ruled that Lawlor was entitled to call Delgado as a witness and that it would provide the funds necessary to make him available. That ruling adequately preserved Lawlor's right to a fair trial. He did not show any need for further funding for the investigator's trip to Uruguay. Accordingly, the court did not abuse its discretion by denying his request.

On the issue of DNA testing, Lawlor made several successive funding requests.  In January 2010, he requested testing of blood recovered from various public places in the apartment building outside Orange's apartment.  The court granted that request.  The next month, he requested testing of 8 foreign hairs found on Orange's pubic region and the court again granted his request.  In April 2010, he requested that a swab be sent to an outside, private laboratory for testing because it did not contain a sample sufficient for testing by the Department of Forensic Sciences ("DFS").  The court also granted that request.

In September 2010, Lawlor requested that hairs and hair fragments in three forensic collections recovered from fingernail scrapings and from Orange's left hand during the autopsy be submitted for testing.  Because some hairs and hair fragments did not include the hair root, they were unsuitable for nuclear DNA testing and had to be subjected to more protracted mitochondrial DNA testing.  The court indicated it would revisit the issue after the human hairs were isolated.[17] After further forensic study of the three hair collections, the court ordered the testing of all the complete human hairs.  It also ordered DFS to select a random sample from the remaining

[17] Orange owned a cat and some of the hair was identified as non-human.

44

91 human hair fragments and to subject the random sample to mitochondrial DNA testing.

In November 2010, Lawlor asked for further testing of the hair fragments. He noted that DFS had classified the 91 fragments from 2 of the forensic collections into 7 distinct groups based on microscopic evaluation of their physical characteristics. He requested that one hair fragment from each group be subjected to mitochondrial DNA testing. The first forensic collection contained 3 groups of hair fragments: one containing 36 fragments, one containing 15, and one containing a single fragment. The second forensic collection contained 4 groups of fragments: one containing 23, one containing 17, and two groups each containing a single fragment. The condition of the majority of the hair fragments indicated that they were not fresh and had likely been in the apartment for some time. Nevertheless, the court again granted his request.

Testing on these 7 final hair fragments resulted in a mitochondrial DNA profile for each fragment. A comparison indicated that the profile for one hair fragment was inconsistent with the profiles of the others. It is not clear from the record whether the single inconsistent fragment came from a group containing other fragments sharing the same microscopic physical characteristics or from one of the unique, single-fragment groups. In other words, it is not clear

45

whether the single inconsistent hair fragment shared physical characteristics with any untested hair fragments.

On January 3, 2011, based on this single inconsistent mitochondrial DNA profile, the fractional amount of the single inconsistent allele detected in the PCR DNA testing on the non-sperm portion of DNA recovered from Orange's abdominal swab, and the fact that the blood recovered from the public areas of the apartment building could not be attributed either to him or Orange, Lawlor moved for a continuance and requested mitochondrial DNA testing of <u>all</u> the forensic evidence.  The court denied the motion and the request:

> The Defense [has] asked the Court to test
> virtually everything that's there, and I have
> yet to see any basis that would produce evidence
> of a second participant. . . .  Absent some
> showing that we're not just continuing to test
> everything that's there, every hair, every item
> in the room, it's simply a wish and a hope and
> speculation, and the motion is denied.

As noted above, a defendant must show a particularized need that expert services will materially assist him in preparing his defense and that denial of such services will result in a fundamentally unfair trial.  <u>Sanchez</u>, 268 Va. at 165, 597 S.E.2d at 199; <u>Thomas</u>, 279 Va. at 169-70, 688 S.E.2d at 241.  However, "[a] particularized need is more than a 'mere hope' that favorable evidence can be obtained through the services of an expert."  <u>Id.</u> at 170, 688 S.E.2d at 241 (quoting

46

Husske, 252 Va. at 212, 476 S.E. 2d at 925); accord Sanchez, 268 Va. at 165, 597 S.E.2d at 199; Morva, 278 Va. at 344, 683 S.E.2d at 562.  The court repeatedly granted Lawlor's successive requests for additional DNA testing, despite the fact that Lawlor admitted participating in the murder and the overwhelming consistency of the forensic evidence recovered from inside Orange's apartment.  It was not an abuse of discretion for the court to rule that a single hair fragment, which was present in the apartment for an undeterminable period of time, was insufficient to justify testing approximately 80 other hair fragments, many of which had different physical characteristics.  Similarly, the court did not abuse its discretion by ruling that the single hair fragment, even coupled with blood recovered from the public areas of the apartment building and the single, fractional inconsistent allele discovered during PCR DNA testing, did not justify subjecting all the forensic evidence to mitochondrial DNA testing.  Rather, as the court observed, the notion that further DNA testing would establish the presence of a second perpetrator was merely "a wish and a hope and speculation."  We therefore will not reverse its denial of the requests.

## 2. JURY INSTRUCTIONS

In assignment of error 103, Lawlor asserts that the court erred by failing to instruct the jurors that they could not

impose a sentence of death if they found he was merely a principal in the second degree.  He argues that the evidence was sufficient to support such an instruction based on (a) the DNA evidence attributable to neither Lawlor nor Orange, as described above, and (b) the possibility that some of Orange's wounds were inflicted by a hammer, though no hammer was found either in her apartment or in his.

As noted above in Claim 7, a jury instruction may be given only if it is supported by more than a mere scintilla of evidence.  Andrews, 280 Va. at 276, 699 S.E.2d at 263; Juniper, 271 Va. at 418, 626 S.E.2d at 419.  When reviewing the evidence to determine whether it supports a proffered instruction, "we view [it] in the light most favorable to the proponent of the instruction."  Vaughn, 263 Va. at 33, 557 S.E.2d at 221.  This means we grant Lawlor all reasonable inferences fairly deducible from it.  Branham v. Commonwealth, 283 Va. 273, 279, 720 S.E.2d 74, 77 (2012).

The absence of a possible weapon from the scene of a murder and the defendant's residence is not evidence that a third party participated in the crime.  It may support a reasonable inference that someone removed the weapon but not the exclusion of the defendant from the universe of people who may have done so.  One also cannot reasonably infer that a defendant did not use a murder weapon based only on its absence

48

from his residence after the crime occurred.  Similarly, even assuming that one could reasonably infer from the two minor inconsistencies in the DNA evidence that a third party was present during the crime, a hypothesis that Lawlor was merely a principal in the second degree extends the inference beyond reasonableness into speculation.  Because there was not more than a scintilla of evidence supporting such a hypothesis, the court did not err in refusing the instruction.

## C. THE PENALTY PHASE OF TRIAL

### CLAIM 11: BIFURCATION OF THE PENALTY PHASE

This claim consists of a single assignment of error, assignment of error 13, in which Lawlor asserts that the circuit court erred by denying his motion to bifurcate the penalty phase into two proceedings:  one in which the jury must unanimously find one or more of the aggravating factors set forth in Code § 19.2-264.2 beyond a reasonable doubt, thereby making him eligible for a sentence of death, followed by one in which the jurors considered his mitigating evidence to determine whether to impose a sentence of death or life imprisonment without parole.  He argues that such a bifurcation is required both by Code § 19.2-264.4(A) and the United States Constitution.  These are questions of law we review de novo. Gallagher v. Commonwealth, 284 Va. 444, 449, 732 S.E.2d 22, 24 (2012).

49

Code § 19.2-264.4(A) requires that "[u]pon a finding that the defendant is guilty of an offense which may be punishable by death, a proceeding shall be held which shall be limited to a determination as to whether the defendant shall be sentenced to death or life imprisonment."  Lawlor argues that a defendant is not "guilty of an offense which may be punishable by death" until after at least one aggravating factor has been proved.  Therefore, he contends, the separate proceeding referred to in Code § 19.2-264.4(A) must occur after that time.

We construe a statute under familiar principles.

> The primary objective of statutory construction is to ascertain and give effect to legislative intent.  When a given controversy involves a number of related statutes, they should be read and construed together in order to give full meaning, force, and effect to each.  Therefore we accord each statute, insofar as possible, a meaning that does not conflict with any other statute.  When two statutes seemingly conflict, they should be harmonized, if at all possible, to give effect to both.

Conger v. Barrett, 280 Va. 627, 630-31, 702 S.E.2d 117, 118 (2010) (citations, internal quotation marks, and alterations omitted).  "[A]n undefined term must be given its ordinary meaning, given the context in which it is used.  Furthermore, the plain, obvious, and rational meaning of a statute is to be preferred over any curious, narrow, or strained construction, and a statute should never be construed in a way that leads to absurd results."  Meeks v. Commonwealth, 274 Va. 798, 802, 651

50

S.E.2d 637, 639 (2007) (citations, internal quotation marks, and alteration omitted).  Where the same term is used in different places within a statutory scheme, we apply the same meaning unless the legislature clearly intended a different one.  Eberhardt v. Fairfax County Emps. Ret. Sys. Bd. of Trs., 283 Va. 190, 195, 721 S.E.2d 524, 526 (2012).

The language at issue in Code § 19.2-264.4(A) is "an offense which may be punishable by death."  This phrase is an integrated relative clause narrowing the universe of offenses to which the subsection applies.  Under Lawlor's interpretation, an offense is not "an offense which may be punishable by death" until after the jury has found at least one of the aggravating factors set forth in Code § 19.2-264.2.  This argument is without merit.

First, Code § 19.2-264.2 also uses the phrase "an offense for which the death penalty may be imposed" to describe the offenses to which that statute applies.  It provides:

> In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court or jury shall (1) after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated

51

> battery to the victim; and (2) recommend that
> the penalty of death be imposed.

Code § 19.2-264.2 (emphasis added). Thus, if the phrase "an

offense for which the death penalty may be imposed" truly is

defined by this section as Lawlor argues, a jury may not

consider the aggravating factors set forth in that section

until after it has found at least one of them and has

recommended a sentence of death. This is an absurd, circular

result. We therefore will not adopt Lawlor's interpretation.

Meeks, 274 Va. at 802, 651 S.E.2d at 639.

Second, while Code § 19.2-264.2 does not define "an

offense for which the death penalty may be imposed," Code

§§ 18.2-10 and 18.2-31 do. Code § 18.2-10 states in relevant

part that "[t]he authorized punishments for conviction of a

felony are: (a) For Class 1 felonies, death . . . or

imprisonment for life . . . ." Code § 18.2-31 enumerates the

offenses "constitut[ing] capital murder, punishable as a Class

1 felony." Accordingly, "an offense for which the death

penalty may be imposed" for the purposes of Code §§ 19.2-264.2

and 19.2-264.4(A) is capital murder and it is "a finding that

the defendant is guilty of" capital murder that triggers the

separate sentencing proceeding. Code § 19.2-264.4(A).

Code § 19.2-264.3 supports this interpretation. Code

§ 19.2-264.3(A) directs the trial court first to submit the

question of guilt or innocence to the jury. Thereafter, and only "[i]f the jury finds the defendant guilty of an offense which may be punishable by death," does it commence a penalty proceeding under Code § 19.2-264.4. Code § 19.2-264.3(C). "If the jury finds the defendant guilty of an offense for which the death penalty may not be imposed," there is no Code § 19.2-264.4 penalty proceeding at all. Code § 19.2-264.3(B). Accordingly, the General Assembly could not have intended the phrase "an offense which may be punishable by death" to mean only those offenses for which one or more aggravating factors have been proved beyond a reasonable doubt because the proceeding in which those factors are presented to the jury only commences after the defendant has been convicted of such an offense.

Citing Ring v. Arizona, 536 U.S. 584 (2002), Lawlor also argues that bifurcation of the penalty phase is required by the United States Constitution. However, that was not the Supreme Court's holding in Ring. Rather, the Court reiterated its holding in Apprendi v. New Jersey, 530 U.S. 466 (2000), that "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact – no matter how the State labels it – must be found by a jury beyond a reasonable doubt." Ring, 536 U.S. at 602 (citing Apprendi, 530 U.S. at 482-83). The Court then extended its Apprendi

rationale to hold that "Arizona's enumerated aggravating factors operate as 'the functional equivalent of' " such factual findings and could not be found by a sentencing judge without a jury.  Id. at 609 (quoting Apprendi, 530 U.S. at 494 n.19).

Lawlor also cites Lockett v. Ohio, 438 U.S. 586 (1978), for the proposition that bifurcating the penalty phase is required to ensure jurors can meaningfully consider all mitigating evidence.  However, while the Supreme Court held in that case that a defendant must be allowed to present "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," it did not require the fact-finder to consider that evidence in a separate proceeding. Id. at 604.

Virginia law complies with these constitutional requirements.  See Code § 19.2-264.4(B) ("Evidence which may be admissible . . . may include the circumstances surrounding the offense, the history and background of the defendant, and any other facts in mitigation of the offense."); Code § 19.2-264.4(C) ("The penalty of death shall not be imposed unless the Commonwealth shall prove [one or more aggravating factors] beyond a reasonable doubt . . . ."); Prieto v. Commonwealth, 278 Va. 366, 413, 682 S.E.2d 910, 935 (2009), cert. denied, ___

U.S. \_\_\_, 130 S.Ct. 3419 (2010) ("Prieto I") ("[W]e hold that in the penalty phase of capital murder trials the death penalty may not be imposed unless the jury unanimously finds either one or both of the aggravating factors . . . beyond a reasonable doubt."); Andrews, 280 Va. at 301, 699 S.E.2d at 277 ("A defendant in a capital case has the constitutional right to present virtually unlimited relevant evidence in mitigation.").

Accordingly, there is no basis for Lawlor's claim that the Constitution requires bifurcation of the penalty phase. For these reasons, the court did not err in denying Lawlor's motion.[18]

CLAIM 1: MITIGATING EVIDENCE

This claim consists of 19 assignments of error asserting that the circuit court erred by excluding specific types of mitigating evidence either as hearsay, irrelevant, or both.

1. GENERAL ADMISSIBILITY OF HEARSAY MITIGATING EVIDENCE

In assignment of error 117, Lawlor asserts that a court may not exclude mitigating evidence on the basis of hearsay. Citing Green v. Georgia, 442 U.S. 95 (1979), and subsequent cases, he argues that the exclusion of mitigating evidence as hearsay violates a defendant's constitutional right to due

---

[18] This appeal does not present, and we do not consider, whether the statute prohibits a circuit court from exercising its discretion to bifurcate the penalty phase. The question here is limited to whether the statute and applicable precedents require it to do so.

process.  This is a question of constitutional interpretation that we review de novo.  Gallagher, 284 Va. at 449, 732 S.E.2d at 24.

In Green, the defendant and another person, Moore, were indicted together but tried separately for a rape and murder. At Moore's trial, a prosecution witness testified that Moore told him that he had killed the victim after ordering Green to leave the scene.  However, when Green attempted to introduce the testimony in his trial, the prosecution objected on the ground that it was hearsay.  The objection was sustained and the evidence was excluded.  442 U.S. at 95-96.

The Supreme Court ruled that excluding the witness's testimony in Green's trial was error.  The Court considered both its relevance and reliability and determined that the prosecution's use of the testimony to secure Moore's conviction and sentence of death was "[p]erhaps [the] most important" factor justifying its admission in Green's trial.  Id. at 97. It held that "[i]n these unique circumstances, 'the hearsay rule may not be applied mechanistically to defeat the ends of justice.'"  Id. (quoting Chambers v. Mississippi, 410 U.S. 284, 302 (1973)) (emphasis added).[19]

---

[19] The Court also considered that Moore's comment to the witness was made spontaneously to a close friend, was against his penal interest, and was independently corroborated by other evidence.  442 U.S. at 97.  These are the same factors the

Thus, Green turned on the fact that the prosecution had introduced and relied upon witness testimony in a separate prosecution for the same crime: it could not subsequently impugn the reliability of that testimony in the related proceeding. By its own terms, Green does not stand for the proposition that evidence may not be excluded on hearsay grounds simply because it is offered as mitigation in the penalty phase of a capital murder trial.

Sears v. Upton, 561 U.S. ___, 130 S.Ct. 3259 (2010), similarly fails to support Lawlor's broad argument. In that case the Supreme Court did not rule that mitigating evidence may not be excluded as hearsay. Rather, citing Green and Chambers, the Court again emphasized that reliability is the touchstone for determining whether such evidence should be admitted. Id. at 3263 & n.6 ("[T]he fact that some of such evidence may have been 'hearsay' does not necessarily undermine its value—or its admissibility—for penalty phase purposes." Rather, "reliable hearsay evidence that is relevant to a capital defendant's mitigation defense should not be excluded

_____

Court considered in Chambers, 410 U.S. at 301-02. Although the Court ruled that exclusion of the testimony at issue in Chambers was improper because the evidence "bore persuasive assurances of trustworthiness," it nevertheless observed that "the accused . . . must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Id. at 302.

by rote application of a state hearsay rule." (emphasis added)).

However, when hearsay evidence does not bear the indicia of reliability present in Green and Chambers, it may properly be excluded even when offered in mitigation. Buchanan v. Angelone, 103 F.3d 344, 349 (4th Cir. 1996) ("The excluded statements also lack the inherent reliability of the statement excluded in Green. The statement in Green was against the declarant's penal interest, made spontaneously to a close friend, and the state itself had relied on the excluded testimony to convict the declarant of capital murder. . . . The evidence in this case discloses that the application of Virginia's hearsay rule did not rise to the level of a constitutional violation.").

Accordingly, the circuit court did not err simply because it declined to overrule each of the Commonwealth's hearsay objections to some of Lawlor's mitigating evidence. We must consider each ruling individually.[20]

2. SPECIFIC RULINGS

---

[20] In assignment of error 124, Lawlor generally assigns error to the court's exclusion of "relevant mitigating evidence in the form of reliable hearsay." The brief contains no independent argument on this assignment of error. Consequently, to the extent it is not encompassed by the assignments of error challenging specific rulings and addressed below, it is abandoned. Rule 5:27(d).

As noted above in Claim 12, we review rulings that evidence is inadmissible for abuse of discretion. Thomas, 279 Va. at 168, 688 S.E.2d at 240.

In assignment of error 132, Lawlor asserts that the court erred by excluding Charles Wakefield's testimony that Lawlor showed remorse. Specifically, he proffered that Wakefield would testify that Lawlor said, "I just don't want to hit anyone" several days after the murder occurred. The Commonwealth objected that the statement was hearsay. Lawlor responded that it was admissible as a statement of his then-existing mental and emotional condition – i.e., that at the time he made the statement to Wakefield, several days after the murder, he did not "want to hit anyone." The court ruled that the statement was irrelevant.

To be admissible as evidence of a then-existing state of mind, the state of mind must be relevant to a material issue. See Clay v. Commonwealth, 262 Va. 253, 257, 546 S.E.2d 728, 730 (2001) (Statements showing state of mind are admissible "provided the statements are relevant and probative of some material issue in the case."). As proffered by Lawlor, Wakefield would have testified that Lawlor no longer wanted to hit anyone. But such testimony would not establish remorse. While the alleged statement may indicate that Lawlor had purged himself of a desire to do violence at that time, it does not

59

encompass any sentiment of regret for his prior violent acts. Moreover, remorse includes "sympathy" or "concern for the victims of the crimes for which he was convicted." Smith v. Commonwealth, 27 Va. App. 357, 364-65, 499 S.E.2d 11, 14 (1998). The proffered testimony includes neither of these attributes. It therefore was not probative of the issue of Lawlor's remorse and the court did not abuse its discretion by excluding it.

In assignments of error 134, 135, 136, 137, and 148, Lawlor asserts that the court erroneously excluded testimony from his former probation officers, Mark Crosby and Kathy Coburn. He argues that they would have testified that Lawlor had suffered childhood sexual abuse. He concedes that the excluded statements were hearsay but contends they are nevertheless admissible. He argues they are reliable because they were made years before to probation officers in the context of supervisory relationships. We disagree.

Lawlor cites no authority for his argument that statements made to probation officers are sufficiently reliable to overcome the hearsay rule. The issue is not whether the probation officers are reliable, but whether the statements Lawlor made to them can be relied upon as truthful under the circumstances, rather than being self-serving or manipulative. The statements at issue are not clothed with any of the indicia

60

of reliability the Supreme Court set forth in Green or

Chambers.  They were not made against Lawlor's penal interest,

they were not made spontaneously to a close friend, and they

were not independently corroborated by other evidence.

Accordingly, the court did not abuse its discretion by

excluding them.

In assignments of error 146 and 147, Lawlor asserts that

the court erred by excluding testimony and written evidence

from Woody Couts, who provided a court-ordered alcohol and drug

dependency assessment while Lawlor was incarcerated 2 years

prior to Orange's murder.  Couts also would have testified that

Lawlor told him of childhood sexual abuse.  Lawlor argues that

the testimony was admissible because the statements were made

for the purposes of obtaining a medical diagnosis or treatment.

Further, he argues that the statements were reliable even if

not covered by that exception to the hearsay rule.  We again

disagree.

We have acknowledged that "a physician [may] testify to a

patient's statements concerning his 'past pain, suffering and

subjective symptoms' to show 'the basis of the physician's

opinion as to the nature of the injuries or illness.' "

Cartera v. Commonwealth, 219 Va. 516, 518, 248 S.E.2d 784, 785-

86 (1978); accord Jenkins v. Commonwealth, 254 Va. 333, 339,

492 S.E.2d 131, 134 (1997).  However, Couts was not a

physician; he was not even licensed as a substance abuse counselor.

Moreover, a statement made for the purpose of medical diagnosis or treatment in contravention of the hearsay rule is admissible because "a patient making a statement to a treating physician recognizes that providing accurate information to the physician is essential to receiving appropriate treatment." Jenkins, 254 Va. at 339, 492 S.E.2d at 134-35.  The exception therefore includes an assessment of reliability.  However, as the circuit court noted,

> The fallacy [in your analogy] is that you believe that a defendant who is incarcerated who talks to a drug counselor is going to be a hundred percent honest as one would who is seeking treatment from a physician.
>
> If I'm seeking treatment from a physician, I want that treatment to cure me of my ill or illness, whatever it is.
>
> A defendant sitting in jail wants to minimize his time, wants to get probation instead of penitentiary time, depending on what the offense is.  And your theory is that [the] defendant will, of course, automatically be one hundred percent honest to the drug treatment counselor.
>
> And we know that's not true, even through your own witnesses, who have said that the most drug-challenged people are not honest, even with their own – even with their own treatment people . . . .

Accordingly, the rationale underlying the medical diagnosis or treatment exception does not apply to substance

62

abuse assessments in the context of incarceration.  The circuit

court did not abuse its discretion by excluding this

testimony.[21]

In assignment of error 131, Lawlor asserts that the court

erred by preventing his investigator, Samuel Dworkin, from

testifying about Lawlor's father's failure to appear at trial.

Lawlor alleges that his father threatened to commit suicide if

he was subpoenaed to testify at trial.  He argues that this

information was relevant because the Commonwealth had objected,

in the presence of the jury, to evidence that his father had

sexually abused other children on the ground that "[t]he man's

not here to defend himself."  He also argues that it may have

disposed the jury to impose a sentence of life imprisonment.

We again disagree.

The court provided Lawlor the opportunity to call Dworkin

to establish that his father was unwilling to appear

voluntarily.  However, the court ruled that the reason Lawlor's

father did not appear at all was that Lawlor chose not to

subpoena him and Lawlor's rationale for that decision was not

relevant.  We agree with the circuit court that a party's

---

[21] In assignment of error 119, Lawlor also generally
assigns error to the court's exclusion of evidence of his
history of sexual abuse.  The brief contains no independent
argument on this assignment of error.  Consequently, to the
extent it is not encompassed by the foregoing assignments of
error, it is abandoned.  Rule 5:27(d).

litigation strategy is not evidence of a fact at issue in the proceeding.  Testimony justifying a party's chosen course at trial therefore is not relevant.  The reasoning behind Lawlor's decision not to subpoena his father was irrelevant and the court did not abuse its discretion by excluding Dworkin's testimony.

In assignments of error 14 and 120, Lawlor asserts that the court erred by denying his motion to allow evidence of the effect his execution would have on his family and friends. Similarly, in assignments of error 128, 141, and 145, he asserts that the court erred by excluding testimony from his sister, Elizabeth Cox, mother, Joann Cox, and friend, Richard Poorman, respectively, about the value of their relationships with him.  He argues that this was relevant mitigating evidence under our decision in Andrews and the Supreme Court's decisions in Lockett and Tennard v. Dretke, 542 U.S. 274 (2004).  We disagree.

In Andrews, we said "[a] defendant in a capital case has the constitutional right to present virtually unlimited relevant evidence in mitigation."  280 Va. at 301, 699 S.E.2d at 277 (emphasis added).

> [T]he meaning of relevance is no different in
> the context of mitigating evidence introduced in
> a capital sentencing proceeding than in any
> other context, and thus the general evidentiary
> standard—any tendency to make the existence of

> any fact that is of consequence to the
> determination of the action more probable or
> less probable than it would be without the
> evidence—applies. . . .  Relevant mitigating
> evidence is evidence which tends logically to
> prove or disprove some fact or circumstance
> which a fact-finder could reasonably deem to
> have mitigating value.

Tennard, 542 U.S. at 284 (citations and internal quotation marks omitted).

In Lockett, the Supreme Court defined the circumstances which a fact-finder could reasonably deem to have mitigating value as those relevant to "the 'character and record of the individual offender and the circumstances of the particular offense.' "  438 U.S. at 601 (quoting Woodson v. North Carolina, 428 U.S. 280, 304 (1976)).  Lockett does not "limit[] the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense."  Id. at 605 n.12.  Therefore, to be relevant to mitigation in the penalty phase of a capital case, evidence must be relevant to these three factors.

As we noted in Cherrix, "Code § 19.2-264.4(B) vests the trial court with the discretion to determine, subject to the rules of evidence governing admissibility, the evidence which may be adduced in mitigation of the offense."  257 Va. at 309, 513 S.E.2d at 653 (citing Coppola v. Commonwealth, 220 Va. 243,

253, 257 S.E.2d 797, 804 (1979), cert. denied, 444 U.S. 1103 (1980)).  In Coppola, we expressly declined to reverse as an abuse of discretion a circuit court's exclusion of evidence addressing the effect of the defendant's arrest and trial on his family as irrelevant to the issue of mitigation.  220 Va. at 253, 257 S.E.2d at 804.  Although Coppola addressed only arrest and trial, not the imposition of a sentence of death, and Code § 19.2-264.4(B) has been amended since that decision, we are not persuaded that the effect on a defendant's family and friends of such a sentence is relevant mitigating evidence "bearing on the defendant's character, prior record, or the circumstances of his offense."  Lockett, 438 U.S. at 605 n.12. The court therefore did not abuse its discretion by excluding this evidence.

### 3. RIGHT NOT TO TESTIFY

In assignments of error 125 and 177, Lawlor asserts that the court erred by ruling that he would have to testify to present his mitigating evidence to the jury.  He identifies 4 specific statements made by the court referring to Lawlor's failure to take the stand himself.

Each of the identified statements was made as the court ruled on an objection by the Commonwealth.[22]  Contrary to

---

[22] The comments were made outside the presence of the jury and therefore could not have influenced its deliberation.

66

Lawlor's assertion, the court did not base its rulings on his exercise of his right against self-incrimination.  Rather, it based these rulings on its determination that the evidence Lawlor was attempting to present was inadmissible hearsay.  The court noted that while the witnesses would not be allowed to present hearsay evidence by testifying to statements Lawlor made to them, the evidence would be admissible if Lawlor testified himself:  then, by definition, it would not be hearsay.

A court does not err by observing outside the presence of the jury that inadmissible hearsay evidence would be admissible if the declarant testified directly – even if the declarant is the defendant.[23]

CLAIM 3: TESTIMONY OF DR. MARK CUNNINGHAM

This claim consists of 6 assignments of error asserting that the circuit court erred by excluding portions of the testimony of Dr. Mark Cunningham.[24]  Lawlor offered Dr.

---

[23] Lawlor also argues the Commonwealth improperly referred to his failure to testify during an objection in the presence of the jury.  However, Lawlor failed to preserve this issue because he did not timely object to the comment or seek a curative instruction or mistrial.  Rule 5:25; Porter, 276 Va. at 256, 661 S.E.2d at 442; Cheng, 240 Va. at 40, 393 S.E.2d at 607.

[24] In assignment of error 185, Lawlor generally assigns error to the court for restricting Cunningham's testimony.  The brief contains no independent argument on this assignment of error so to the extent it is not encompassed by the other assignments of error, it is abandoned.  Rule 5:27(d).

Cunningham as an expert witness to rebut the Commonwealth's evidence on the future dangerousness aggravating factor and to provide mitigating evidence.[25] As noted above in Claims 1 and 12, we review a ruling that evidence is inadmissible for abuse of discretion. Thomas, 279 Va. at 168, 688 S.E.2d at 240.

As an initial matter, we note that a defendant's evidence rebutting the risk of future dangerousness serves a purpose different from mitigating evidence. While the same evidence may be adduced to serve both purposes, the purposes must not be conflated.

Pursuant to Code §§ 19.2-264.2 and 19.2-264.4(C), a sentence of death may not be imposed unless the Commonwealth has proved one or both of the aggravating factors set out in the statutes beyond a reasonable doubt. Where the Commonwealth alleges that the future dangerousness factor applies and adduces evidence to prove it, the defendant has a due process right to rebut that evidence. Simmons v. South Carolina, 512 U.S. 154, 164 (1994) (citing Skipper v. South Carolina, 476

Similarly, we find no argument in the brief related to assignment of error 190 and it too is abandoned. Id.

[25] The aggravating factor commonly referred to as the risk of future dangerousness factor provides that "a sentence of death shall not be imposed unless the . . . jury shall . . . after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society . . . ." Code § 19.2-264.2; accord Code § 19.2-264.4(C).

U.S. 1, 5 n.1 (1986)). However, where the Commonwealth does not pursue the future dangerousness aggravating factor, there is nothing for the defendant to rebut.

The statutes also define the evidence relevant to prove the future dangerousness aggravating factor, or the probability that the defendant "would commit criminal acts of violence that would constitute a continuing serious threat to society." Code §§ 19.2-264.2 and 19.2-264.4(C). The relevant evidence is "the past criminal record of convictions of the defendant," Code § 19.2-264.2, and "evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused." Code § 19.2-264.4(C); see also Morva, 278 Va. at 349, 683 S.E.2d at 565 ("The relevant evidence surrounding a determination of future dangerousness consists of the defendant's history and the circumstances of the defendant's offense.").

By contrast, a defendant is always entitled to present relevant mitigating evidence in a capital case. Andrews, 280 Va. at 301, 699 S.E.2d at 277 (citing Tennard, 542 U.S. at 285, and Lockett, 438 U.S. at 608). This right is grounded in the Eighth Amendment. Simmons, 512 U.S. at 164 (citing Skipper, 476 U.S. at 4).

Mitigating evidence includes "any aspect of a defendant's character or record and any of the circumstances of the offense

that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604. "[A] defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character" and therefore is relevant mitigating evidence. Skipper, 476 U.S. at 7.

In Bell, we described evidence of a defendant's disposition to adjust to prison life as "future adaptability" evidence. 264 Va. at 201, 563 S.E.2d at 714. We also stated that it must be specific to the individual defendant or relevant "as a foundation for an expert opinion." Id.; accord Juniper, 271 Va. at 427, 626 S.E.2d at 424. With these principles in mind, we turn to Lawlor's arguments.

1. REBUTTING THE RISK OF FUTURE DANGEROUSNESS

In assignments of error 180 and 188, Lawlor asserts that the court erred by excluding Dr. Cunningham's testimony about his risk of future dangerousness in prison. He argues that the court repeatedly excluded such testimony by sustaining the Commonwealth's objections and by denying him the opportunity to recall Dr. Cunningham following a proffer of additional testimony.

We thoroughly reviewed the evidence that is admissible to rebut the future dangerousness aggravating factor in Morva based on Simmons, Skipper, and Code §§ 19.2-264.2 and 19.2-

70

264.4(C).  We reiterated our earlier holding that "[t]he relevant inquiry is not whether a defendant <u>could</u> commit criminal acts of violence in the future but whether he <u>would</u>." <u>Id.</u> at 349, 683 S.E.2d at 564 (quoting <u>Burns</u>, 261 Va. at 339-40, 541 S.E.2d at 893) (internal alterations and quotation marks omitted).  In other words, the issue is not whether the defendant is physically capable of committing violence, but whether he has the mental inclination to do so.  <u>Compare</u> Webster's Third New International Dictionary 517 (1993) (defining "could" in part as the conditional of "can") <u>and</u> <u>id.</u> at 323 (defining "can" in part as "<u>to be able</u> to do, make, or accomplish" (emphasis added)) <u>with</u> <u>id.</u> at 2638 (defining "would" in part as the conditional of "will") <u>and</u> <u>id.</u> at 2616 (defining "will" in part as "<u>to be inclined</u> to" (emphasis added)).

Accordingly, evidence of restrictions on a prisoner's physical capacity to commit violence due to generalized prison conditions is not relevant:

> Increased security measures and conditions of prison life that reduce the likelihood of future dangerousness of all inmates is general information that is irrelevant to the inquiry required by Code §§ 19.2-264.2 and 19.2-264.4(C).  <u>See</u> [<u>Juniper</u>, 271 Va. at 426-27, 626 S.E.2d at 423-24]; <u>Porter</u>, 276 Va. at 252, 661 S.E.2d at 440.  The generalized competence of the Commonwealth to completely secure a defendant in the future is not a relevant inquiry.  Our precedent is clear that a court

> should exclude evidence concerning the
> defendant's diminished opportunities to commit
> criminal acts of violence in the future due to
> the security conditions in the prison. <u>Burns</u>,
> 261 Va. at 339-40, 541 S.E.2d at 893-94.

<u>Morva</u>, 278 Va. at 350, 683 S.E.2d at 565. In short, the question of future dangerousness is about the defendant's <u>volition</u>, not his <u>opportunity</u>, to commit acts of violence. Evidence of custodial restrictions on opportunity therefore is not admissible.

Lawlor argues that Dr. Cunningham's testimony was not about generalized prison conditions. He argues it was sufficiently particularized based on attributes such as his age, prior behavior while incarcerated, education, and employment history, which are admissible under <u>Morva</u>. He asserts that the court excluded the testimony simply because Dr. Cunningham's opinion was restricted to Lawlor's risk of dangerousness to "prison society" or "while in prison." He contends this was error because if sentenced to life imprisonment, prison society would be the only society to which he could pose a risk.

We previously considered and rejected this argument in <u>Lovitt v. Commonwealth</u>, 260 Va. 497, 537 S.E.2d 866 (2000), <u>cert. denied</u>, 534 U.S. 815 (2001). In that case we said,

> Code § 19.2-264.2 requires that the jury make a
> factual determination whether the defendant
> "would commit criminal acts of violence that

72

would constitute a continuing serious threat to society." The statute does not limit this consideration to "prison society" when a defendant is ineligible for parole, and we decline Lovitt's effective request that we rewrite the statute to restrict its scope.

Id. at 517, 537 S.E.2d at 879. Thus, evidence concerning a defendant's probability of committing future violent acts, limited to the penal environment, is not relevant to consideration of the future dangerousness aggravating factor set forth in Code §§ 19.2-264.2 and 19.2-264.4(C).

Accordingly, the excluded testimony ran afoul of Lovitt to the extent it was offered to rebut evidence of the future dangerousness aggravating factor. It expressed Dr. Cunningham's opinion of Lawlor's risk of future violence in prison society only, rather than society as a whole. To be admissible as evidence rebutting the future dangerousness aggravating factor under the statutes, expert opinion testimony must not narrowly assess the defendant's continuing threat to prison society alone. The court therefore did not abuse its discretion by excluding Dr. Cunningham's testimony as rebuttal evidence on the future dangerousness aggravating factor.

## 2. MITIGATING EVIDENCE

In assignments of error 179 and 189, Lawlor asserts that even if Dr. Cunningham's testimony was properly excluded as

rebuttal evidence, it should have been admitted as mitigating evidence.

General conditions of prison life also are inadmissible as mitigating evidence. Walker v. Commonwealth, 258 Va. 54, 70, 515 S.E.2d 565, 574 (1999), cert. denied, 528 U.S. 1125 (2000), and Cherrix, 257 Va. at 309-10, 513 S.E.2d at 653. Our determination that such evidence may properly be excluded was based on the description of relevant mitigating evidence the Supreme Court set forth in Lockett. As noted above in Claim 1, that case did "not limit 'the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.' " Cherrix, 257 Va. at 309, 513 S.E.2d at 653 (quoting Lockett, 438 U.S. at 605 n.12). Evidence of general prison conditions therefore may properly be excluded even as mitigating evidence.

Significantly, though, Lockett made clear that " 'consideration of the character and record of the individual offender' " is required by the United States Constitution. 438 U.S. at 604 (quoting Woodson, 428 U.S. at 304). "[T]he sentencer [must] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."

74

_Id._ (emphasis in original).  As noted above, future adaptability evidence is relevant character evidence.  _Bell_, 264 Va. at 201, 563 S.E.2d at 714.  Nevertheless, future adaptability evidence must be specific to the individual defendant or relevant "as a foundation for an expert opinion." _Id.; accord Juniper_, 271 Va. at 427, 626 S.E.2d at 424.

In this context, a defendant's probability of committing violence, even when confined within a penal environment, is relevant as mitigating evidence of his character and is constitutionally mandated under _Lockett_, provided the evidence establishing that probability arises specifically from his character and is sufficiently personalized to him.  As with evidence rebutting the future dangerousness aggravating factor, the relevant inquiry is narrowly focused on whether the particular defendant is inclined to commit violence in prison, not whether prison security or conditions of confinement render him incapable of committing such violence.  Unlike inclination or volition, capacity – i.e., what a prisoner could do – is not relevant to character.

Further, testimony relevant to a defendant's propensity to commit violence while incarcerated necessarily must be personalized to the defendant based on his specific, individual past behavior or record.  Otherwise it cannot constitute evidence of the defendant's personal character and would be

75

irrelevant even for purposes of mitigation. See Morva, 278 Va. at 350, 683 S.E.2d at 565; Juniper, 271 Va. at 426-27, 626 S.E.2d at 423-24.

We stress that characteristics alone are not character. Merely extracting a set of objective attributes about the defendant and inserting them into a statistical model created by compiling comparable attributes from others, to attempt to predict the probability of the defendant's future behavior based on others' past behavior does not fulfill the requirement that evidence be "peculiar to the defendant's character, history, and background" under Morva, 278 Va. at 350, 683 S.E.2d at 565. To the contrary, it is mere "statistical speculation." Porter, 276 Va. at 255, 661 S.E.2d at 442.

To satisfy Morva's standard, the evidence must consist of more than the recitation of shared attributes as the basis for predicting similar behavior. Evidence of a defendant's objective attributes may be relevant as foundation for expert opinion establishing his character, history, and background under this standard. See Juniper, 271 Va. at 427, 626 S.E.2d at 424; Bell, 264 Va. at 201, 563 S.E.2d at 714. However, the mere fact that an attribute is shared by others from whom a statistical model has been compiled, and that the statistical model predicts certain behavior, is neither relevant to the defendant's character nor a foundation for expert opinion. See

76

Porter, 276 Va. at 255, 661 S.E.2d at 442.  Merely stating that the percentage of violent crimes committed by a specified demographic group sharing one of the defendant's attributes is lower, based on statistical models, than others who do not share it does not suffice.

Lawlor submitted a written proffer of questions he would propound to Dr. Cunningham, and Dr. Cunningham's expected answers to them.  The proffer contains the following proposed exchanges:

1. Q: What is your expert opinion as to how Mark Lawlor's behavior pattern while [previously] in custody/incarceration, impacts his future prison adaptability?
   A: Because of Mark Lawlor's prior adaption in prison and jail, and particularly because of his lack of violent activity in these settings, Mr. Lawlor represents a low likelihood of committing acts of violence while in prison.
2. Q: What is your expert opinion as to how Mark Lawlor's age impacts his future prison adaptability? Does that opinion take into account the fact that Mr. Lawlor committed his current crime at age 43?
   A: Because of Mark Lawlor's age of 45 years old, Mr. Lawlor represents a low likelihood of committing acts of violence while in prison. The fact that Mr. Lawlor committed his current offense at age 43 has been taken into account in forming this opinion, but it does not change my opinion about his future prison adaptability.

3. Q: What is your expert opinion as to how Mark Lawlor's education impacts his future prison adaptability? Is this risk factor predictive of violence in the free community as well?

A: The fact that Mr. Lawlor has earned his G.E.D. is predictive of a low likelihood of committing acts of violence while in prison. This risk factor is far more predictive of violent conduct in the prison context than it is in the free community context.

4. Q: What is your expert opinion as to how Mark Lawlor's employment history impacts his future prison adaptability?

A: Mark Lawlor's employment history in the community is predictive that Mr. Lawlor represents a low likelihood of committing acts of violence while in prison.

5. Q: What is your expert opinion as to how Mark Lawlor's continued contact with his family and friends in the community impacts his future prison adaptability?

A: Mark Lawlor's continued contact with these individuals while in prison, is predictive that Mr. Lawlor represents a low likelihood of committing acts of violence while in prison.

6. Q: What is your expert opinion as to how Mark Lawlor's past correctional appraisal impacts his future prison adaptability?

A: Mark Lawlor's past correctional appraisal is predictive that Mr. Lawlor represents a low likelihood of committing acts of violence while in prison.

7. Q: What is your expert opinion as to how Mark Lawlor's lack of gang affiliation impacts his future prison adaptability?

A: Mark Lawlor's lack of gang affiliation is predictive that Mr. Lawlor represents a low likelihood of committing acts of violence while in prison.

8. Q: Have you reached an opinion, to a reasonable degree of psychological certainty, based on all of the factors relevant to your studies of prison risk assessment, as to what Mark Lawlor's risk level is for committing acts of violence while incarcerated? And if so, what is your opinion?

A: Yes. It is my opinion based on my analysis of all of the relevant risk factors which are specific to Mr. Lawlor's prior history and background, that Mr. Lawlor represents a very low risk for committing acts of violence while incarcerated.

9. Q: Are all of your opinions concerning the above questions and answers about Mr. Lawlor, grounded in scientific research and peer-reviewed scientific literature?

A: Yes.

Of these proffered answers, only the first meets the standard for admissibility as future adaptability mitigating evidence. The others merely (a) supply an item of demographic data coupled with an unexplained, conclusory opinion that the datum indicates Lawlor will present a low risk of violence while incarcerated or (b) lay the foundation that the opinion is based on statistical models. While each datum is extracted from Lawlor's personal history, it sheds no light on his character, why he committed his past crimes and the crime for

79

which he stood convicted, or how would it influence or affect his behavior while incarcerated.  It therefore is not personalized for the purposes of establishing future adaptability.  In short, the proffered testimony is not probative of Lawlor's "disposition to make a well-behaved and peaceful adjustment to life in prison."  Skipper, 476 U.S. at 7.  Accordingly, the circuit court did not abuse its discretion in excluding these questions and answers.

While the first proffered answer would be admissible because it establishes the fact that Lawlor did not engage in violent behavior during past periods of incarceration, that fact was already known to the jury through other evidence.  For example, Dr. Cunningham testified without objection that Lawlor's records of incarceration covered a period of 120 months of intermittent custody and the only violent behavior recorded for the entire duration of that time was when he was the victim of two fistfights in January 2009, for which he incurred no disciplinary action.  Dr. Cunningham also testified that the Virginia Department of Corrections had classified Lawlor as presenting a low likelihood of committing violence. Because the excluded testimony was either cumulative or inadmissible, the court did not abuse its discretion.

CLAIM 14: THE VILENESS AGGRAVATING FACTOR

This claim consists of 5 assignments of error asserting that the circuit court erred by allowing the jury to consider the vileness aggravating factor.[26]

## 1. EXCLUSION OF EVIDENCE

Lawlor asserts in assignments of error 149 and 156 that the trial court erred by excluding evidence that he originally was charged with first-degree murder rather than capital murder.[27] He argues that this evidence was relevant to rebut the vileness aggravating factor. However, as explained below, Lawlor did not present this argument to the court for its consideration.

While Lawlor asserted in a hearing on March 8, 2011 that the evidence subject to these assignments of error should be admitted, he argued only that the records were relevant to show his conduct in custody and because they "show[] the dates he was brought in[to detention] and why he was brought in and

_____

[26] The aggravating factor commonly referred to as the vileness factor provides that "a sentence of death shall not be imposed unless the . . . jury shall . . . find . . . that [the defendant's] conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim . . . ." Code § 19.2-264.2; accord Code § 19.2-264.4(C).

[27] In assignment of error 123, Lawlor also generally assigns error to the court's "limiting and excluding evidence . . . to rebut the Commonwealth's allegation of vileness." Because he presents no argument about any rulings other than those challenged in assignments of error 149 and 156, this assignment of error is abandoned to the extent it is not encompassed by them. Rule 5:27(d).

measures taken." The court allowed all evidence showing Lawlor's conduct but excluded the portion that referred to the original charge of first-degree murder having been superseded by a charge of capital murder. Lawlor said, "Your Honor, that's fine. . . . I don't intend to make the argument in any more of a sophisticated way than I have. If the court disagrees with me, I understand. I don't want to go back and forth but that's why we offered it."

On March 10, 2011, Lawlor filed a more nuanced, written motion in which he raised the argument he makes on appeal: that the original charge was relevant as rebuttal evidence to the vileness aggravating factor. However, our review of the record reveals that Lawlor never argued the written motion, sought or obtained a ruling, or otherwise provided the court with an opportunity to rule on it. We therefore will not consider it. Rule 5:25; Scialdone v. Commonwealth, 279 Va. 422, 437, 689 S.E.2d 716, 724 (2010) ("[T]he provisions of Rule 5:25 protect the trial court from appeals based upon undisclosed grounds. . . . In analyzing whether a litigant has satisfied the requirements of Rule 5:25, this Court has consistently focused on whether the trial court had the opportunity to rule intelligently on the issue. If the opportunity to address an issue is not presented to the trial court, there is no ruling by the trial court on the issue, and

thus no basis for review or action by this Court on appeal."
(citations, internal quotation marks, and alterations
omitted)).

## 2. CONSTITUTIONAL CHALLENGES

In assignments of error 2 and 4, Lawlor asserts that the
court erred by allowing the Commonwealth to seek a sentence of
death based on the vileness aggravating factor because it is
unconstitutionally vague.  We have previously considered and
rejected these arguments.  Gray v. Commonwealth, 274 Va. 290,
314-15, 645 S.E.2d 448, 463 (2007), cert. denied, 552 U.S. 1151
(2008) (citing Wolfe v. Commonwealth, 265 Va. 193, 208, 576
S.E.2d 471, 480, cert. denied, 540 U.S. 1019 (2003) and Beck v.
Commonwealth, 253 Va. 373, 387, 484 S.E.2d 898, 907, cert.
denied, 522 U.S. 1018 (1997)).  The circuit court did not err
in adhering to our controlling precedents.  We also find no
reason to modify the views we previously expressed in them.

Lawlor also argues that the composite sub-factors to the
vileness aggravating factor must be individually proven beyond
a reasonable doubt and agreed upon unanimously by the jury.  We
recently rejected this argument in Prieto II, 283 Va. at 180-
81, 721 S.E.2d at 503, which had not been decided at the time
of the proceedings in this case.  The court's ruling was
consistent with our holding in Prieto II and we decline
Lawlor's invitation to revisit it.

CLAIM 9: JURY INSTRUCTIONS

In this claim, Lawlor challenges the instructions given to the jury at the conclusion of the penalty phase in 4 assignments of error.[28] As noted above in Claims 7 and 13, we review whether a jury instruction accurately states the relevant law de novo. Summit Group Props., 283 Va. at 782, 724 S.E.2d at 721.

Even if accurate, a jury instruction may be given only if it is supported by more than a mere scintilla of evidence, Andrews, 280 Va. at 276, 699 S.E.2d at 263, when viewed in the light most favorable to the proponent of the instruction. Vaughn, 263 Va. at 33, 557 S.E.2d at 221. The proponent is entitled to all reasonable inferences fairly deducible from the evidence. Branham, 283 Va. at 279, 720 S.E.2d at 77. Nevertheless, a court may exercise its discretion and properly exclude an instruction that both correctly states the law and is supported by the evidence when other "granted instructions fully and fairly cover" the relevant principle of law. Daniels v. Commonwealth, 275 Va. 460, 466, 657 S.E.2d 84, 87 (2008)

---

[28] In assignment of error 160, Lawlor also generally assigns error to the court's denial of his proffered instructions. Because he presents no argument about any instructions other than those specifically identified in assignments of error 162, 164, 165, and 168, this assignment of error is abandoned to the extent it is not encompassed by them. Rule 5:27(d).

(internal quotation marks omitted); <u>Juniper</u>, 271 Va. at 431, 626 S.E.2d at 426.

In assignment of error 168, Lawlor asserts that the court erred by denying his motion to exclude the torture sub-factor from Instructions S-2a and S-3a, relating to the vileness aggravating factor, because there was no evidence that Orange had been tortured. He cites <u>Quintana v. Commonwealth</u>, 224 Va. 127, 149, 295 S.E.2d 643, 654 (1982), a case in which the circuit court eliminated the torture element although the victim had been struck with a hammer 11 times.

"Torture" as set forth in the vileness aggravating factor is not defined by statute. However, Virginia's vileness aggravating factor is identical to the State of Georgia's aggravating factor reviewed by the Supreme Court in <u>Godfrey v. Georgia</u>, 446 U.S. 420 (1980). <u>Compare</u> Code §§ 19.2-264.2 and 19.2-264.4(C) <u>with</u> <u>Godfrey</u>, 446 U.S. at 422 (quoting Ga. Code Ann. § 27-2534.1(b)(7) (1978)). The Supreme Court of Georgia has defined the torture element of its statute:

> [T]orture occurs when a living person is subjected to the unnecessary and wanton infliction of severe physical or mental pain, agony or anguish. Besides serious physical abuse, torture includes serious sexual abuse or the serious psychological abuse of a victim resulting in severe mental anguish to the victim in anticipation of serious physical harm.

West v. State, 313 S.E.2d 67, 71 (Ga. 1984) (appendix).[29]

Courts of last resort in other states have similarly formulated definitions of torture that include physical and psychological aspects. E.g., State v. White, 668 N.W.2d 850, 857 (Iowa 2003) ("'[T]orture' is either physical and/or mental anguish."); State v. Ross, 646 A.2d 1318, 1361 (Conn. 1994) (holding torture may be psychological as well as physical). But cf. Newman v. State, 106 S.W.3d 438, 461 (Ark. 2003) (reciting a statutory distinction between torture and mental anguish under Ark. Code Ann. § 5-4-604(b)(B)(ii)). The psychological aspect of torture may be established, for example, "where the victim is in intense fear and is aware of, but helpless to prevent, impending death . . . for an appreciable lapse of time." Ex parte Key, 891 So. 2d 384, 390 (Ala. 2004).

---

[29] "Aggravated battery" is also undefined by Virginia statute, though it was and remains a statutory offense in Georgia. Godfrey, 446 U.S. at 431 n.13 (citing Ga. Code Ann. § 26-1305 (1978)); see also West, 313 S.E.2d at 69; Ga. Code Ann. § 16-5-24(a). The elements of that statutory offense define aggravated battery for the purpose of establishing the aggravating factor under Georgia law. West, 313 S.E.2d at 71 (appendix). Similarly, though "depravity of mind" is undefined by statute in both Virginia and Georgia, the Georgia Supreme Court has defined it as "a reflection of an utterly corrupt, perverted or immoral state of mind." Id. The meanings of these two terms for the purposes of the Virginia vileness aggravating factor are not at issue in Lawlor's appeal and we express no opinion on them.

In this case, unlike Quintana, the medical evidence of aspirated blood and defensive wounds established that Orange was alive and conscious during some of the 47 blows she sustained. Viewed in the light most favorable to the Commonwealth, the proponent of the instructions, there is more than a mere scintilla of evidence that Orange was tortured within the meaning of Code §§ 19.2-264.2 and 19.2-264.4(C). Accordingly, the court did not err in giving the proposed instructions.

In assignment of error 164, Lawlor asserts that the court erred by denying his proposed Instruction S-A. He argues that the Commonwealth's Instructions S-2a and S-3a erroneously instructed the jurors that they could not impose a sentence of life imprisonment unless they found that a sentence of death was not justified. In particular, he challenges the portion of the two instructions that included the language:

> However, even if you find that the Commonwealth has proved [one or] both of the aggravating factors beyond a reasonable doubt and the jury has so found unanimously, if you nevertheless believe from all the evidence, including evidence in mitigation, that the death penalty is not justified, then you shall fix the punishment of the defendant at [life imprisonment].

However, this argument is not within the scope of the assignment of error.

87

Assignment of error 164 states, "The trial court erred in denying Mr. Lawlor's proffered penalty phase instruction S-A regarding whether the jury may impose a sentence of life even if it is unanimous regarding the factors necessary to impose a sentence of death."  Neither this nor any other assignment of error challenges the Commonwealth's proposed instructions on the basis that they misled the jurors into believing they could not impose a sentence of life imprisonment.  We consider only arguments within the scope of the assignment of error.  Rule 5:27(d); Teleguz v. Commonwealth, 273 Va. 458, 484, 643 S.E.2d 708, 725 (2007), cert. denied, 552 U.S. 1191 (2008).  We therefore do not consider whether Instructions S-2a and S-3a misled the jurors into believing they could not impose a sentence of life imprisonment.

In assignment of error 162, Lawlor asserts that the court erred by denying his proposed Instruction S-L.  He again argues that the instruction would have remedied alleged defects in Instructions S-2a and S-3a which, according to Lawlor, misled the jurors about their ability to impose a sentence of life imprisonment.  However, this argument is again outside the scope of the assignment of error.

Assignment of error 162 states, "The trial court erred in denying Mr. Lawlor's proffered penalty phase instruction S-L and in failing to instruct the jury that a sentence of life

88

without the possibility of parole is the default sentence for capital murder."  As noted above, no assignment of error challenges Instructions S-2a and S-3a on the ground that they misled the jurors about their ability to impose a sentence of life imprisonment.  Because Lawlor's argument is again outside the scope of the assignment of error, we will not consider it. Rule 5:27(d); Teleguz, 273 Va. at 484, 643 S.E.2d at 725.

In assignment of error 165, Lawlor asserts that the court erred by denying his proposed Instruction S-C.  However, there is only one Instruction S-C in the record and it is marked "granted."  To the extent Lawlor offered another Instruction S-C that was denied, it appears in neither the joint appendix nor the manuscript record.[30]  "We cannot review the ruling of a lower court for error when the appellant does not . . . provide us with a record that adequately demonstrates that the court erred."  Prince Seating Corp., 275 Va. at 470, 659 S.E.2d at 307.  Consequently, we cannot consider this assignment of error.

CLAIM 2: IMPRISONMENT FOR LIFE WITHOUT PAROLE

This claim consists of 11 assignments of error asserting that through rulings on jury instructions and answers to questions from the jury during its penalty phase deliberations,

---

[30] The record does include a description of language from an alternative Instruction S-C but the entire, verbatim instruction is not clear.

89

the circuit court erred by misleading the jurors into believing that Lawlor could be released from prison if they imposed a sentence of life imprisonment.[31]

## 1. JURY INSTRUCTIONS

As noted above in Claims 7, 9, and 13, we review jury instructions "to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." Cooper, 277 Va. at 381, 673 S.E.2d at 187 (internal quotation marks omitted). A court may in its discretion properly exclude an instruction when other instructions fully and fairly cover the relevant principle of law. Daniels, 275 Va. at 466, 657 S.E.2d at 87.

---

[31] In assignment of error 186, Lawlor asserts the court's error also extended to rulings and comments during Dr. Cunningham's testimony. However, he cites to no place in the record where the court made such rulings and comments or where he preserved objection to them. Accordingly, we do not consider this assignment of error. Rule 5:27(c). The court's rulings during Dr. Cunningham's testimony are also included in assignment of error 187, but we likewise do not consider that portion of it. Id.

Similarly, in assignments of error 193 and 194, he asserts that the court also erred by misleading the jurors that they could not consider his risk of future dangerousness in prison in rulings relating to jury selection and Dr. Cunningham's testimony. Again, he cites to no place in the record where the court made such rulings and comments or where he preserved objection to them. Accordingly, we do not consider those portions of these assignments of error. Id. In addition, his argument on jury instructions is limited to his assertion that they misled the jury into believing he would not spend his sentence in prison if sentenced to life imprisonment. The portions of these assignments of error relating to jury instructions therefore are abandoned. Rule 5:27(d).

In assignment of error 167, Lawlor asserts that the court erred by granting the Commonwealth's proposed Instruction S-8a relating to the future dangerousness aggravating factor. He argues that the instruction failed to inform the jury that he would spend the rest of his life in prison if not sentenced to death. In considering Lawlor's objection to the instruction, the court observed that other granted instructions informed the jury that a sentence of life imprisonment meant life without parole and declined to add the information to Instruction S-8a.

Instruction S-4, which the court granted, stated, "The words 'imprisoned for life' mean imprisonment for life without possibility of parole." This instruction adequately informed the jury of the law and the court did not err in declining to modify Instruction S-8a as Lawlor suggested.

In assignment of error 187, Lawlor asserts that the court erred by denying his proposed Instruction S-J. That instruction stated, "The words 'imprisonment for life' mean[] imprisonment for life without possibility of parole. In other words, if sentenced to life imprisonment, Mark Lawlor will never be released on parole." The jury was adequately informed of the meaning of life imprisonment by Instruction S-4, which the court granted. The court therefore did not abuse its discretion by refusing Lawlor's proffered instruction.

91

## 2. ANSWERS TO JURY QUESTIONS

In assignments of error 187, 193, 194, 195, 196, 198, 199, 200, and 202, Lawlor asserts that the court erred by answering the jury's questions during its penalty phase deliberations. We review the court's answers to questions propounded by the jury for abuse of discretion. Marlowe v. Commonwealth, 2 Va. App. 619, 625, 347 S.E.2d 167, 171 (1986).

The jury asked three questions. The initial question was, "Re: 'Continuing threat to society[,]' Society means prison society, or society in general?" The court answered, "Society is not limited to 'prison society' but includes all society; prison and society in general. Your focus must be on the particular history and background of the defendant, Mark Lawlor, and the circumstances of his offense." Lawlor expressly consented to the court's answer. Thus, to the extent these assignments of error encompass that answer, they are not preserved. Rule 5:25.

Thereafter, the jury asked two follow-up questions simultaneously. The first follow-up question was "Are we to consider 'society in general' is free society or Mark Lawlor as a prisoner in society inside & outside the wire?" In response, the court directed the jury to its answer to its first question and reiterated, "Society means all of society. All of society

includes prison society as well as non-prison, i.e., <u>all</u> society."

Lawlor objected to the court's answer, arguing that a sentence of life imprisonment means life without the possibility of parole and the only relevant society therefore was prison society. The court overruled his objection because the jury already had been instructed that life imprisonment means life without parole and because the relevant inquiry is society in general, not prison society.

The second follow-up question was "If imprisoned for life, what physical constraints would Mark Lawlor be under outside of his cell while exposed to other persons? Inside prison? Outside prison?" The court responded, "The circumstances of Mr. Lawlor once he is delivered to the Department of Corrections is not a matter [with] which you should concern yourself."

Lawlor again objected, arguing that prison conditions could be relevant mitigating evidence. He also argued that the question asked only about imprisonment for life rather than imprisonment for life without parole. The court ruled that the conditions of confinement were not relevant to the jury's deliberations and again ruled that other instructions informed them that life imprisonment meant life without parole.

Instruction S-4 adequately informed the jury that life imprisonment meant life without parole.  Further, in Lovitt, we expressly determined that "society" for the purposes of the future dangerousness aggravating factor was society as a whole, not merely prison society.  260 Va. at 517, 537 S.E.2d at 879. We reaffirm that holding in Claim 3 of this case.  Finally, we ruled that the general conditions of confinement and prison security are not relevant either to future dangerousness or as mitigating evidence in Morva, 278 Va. at 350, 683 S.E.2d at 565, Juniper, 271 Va. at 425-27, 626 S.E.2d at 423-24, Bell, 264 Va. at 201, 563 S.E. 2d at 714, Walker, 258 Va. at 70, 515 S.E.2d at 574, Cherrix, 257 Va. at 310, 513 S.E.2d at 653, and in Claims 3 and 4 of this case.  Accordingly, the court did not abuse its discretion by overruling Lawlor's objections.

D. GENERAL STATUTORY AND CONSTITUTIONAL CHALLENGES

CLAIM 10: THE CONSTITUTIONALITY OF CODE § 19.2-264.5

This claim consists of 7 assignments of error challenging Code § 19.2-264.5 generally and as the circuit court applied it in Lawlor's case.

1. FACIAL UNCONSTITUTIONALITY

In assignment of error 7, Lawlor asserts that the court erred by denying his motion to declare Code § 19.2-264.5 unconstitutional.  The statute states that "upon good cause shown, the court may set aside the sentence of death and impose

a sentence of imprisonment for life."  Code § 19.2-264.5 (emphasis added).  He argues that permitting the court such discretion is unconstitutional.

We have previously considered and rejected Lawlor's argument.  Prieto I, 278 Va. at 416, 682 S.E.2d at 937 (citing Juniper, 271 Va. at 389, 626 S.E.2d at 401, Teleguz, 273 Va. at 474, 643 S.E.2d at 719, and Breard v. Commonwealth, 248 Va. 68, 76, 445 S.E.2d 670, 675-76, cert. denied, 513 U.S. 971 (1994)).  The circuit court did not err in adhering to our controlling precedents.  We also find no reason to modify the views we previously expressed in them.

## 2. UNCONSTITUTIONAL AS-APPLIED

Lawlor also asserts in assignments of error 207, 208, 209, and 210 that the court erred in the exercise of its discretion under the statute because it considered improper factors in denying his motion to set aside the jury's recommendation. Specifically, Lawlor argues that the court erred by considering the defense strategy and representations in pre-trial motions, finding that Lawlor had not expressed remorse, and noting that Lawlor did not testify on his own behalf in the penalty phase.[32]

---

[32] In assignment of error 206, Lawlor also generally assigns error to the court's failure to find good cause to set aside the jury's recommendation and impose a sentence of life imprisonment.  The brief contains no independent argument on this assignment of error.  Consequently, to the extent it is not encompassed by his other assignments of error, it is

95

Code § 19.2-264.5 requires the preparation of a post-sentence report prior to the imposition of a sentence of death. "After consideration of the report, and upon good cause shown, the court may set aside the sentence of death and impose a sentence of imprisonment for life." Code § 19.2-264.5. We review a trial court's decision on a motion to set aside a sentence of death for abuse of discretion. See Yarbrough v. Commonwealth, 262 Va. 388, 398, 551 S.E.2d 306, 312 (2001) (noting the trial court's authority under Code § 19.2-264.5 to set aside a jury's sentence of death is discretionary), cert. denied, 535 U.S. 1060 (2002).

As noted above in Claim 4, there are "three principal ways" by which a court abuses its discretion: "when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." Landrum, 282 Va. at 352, 717 S.E.2d at 137 (internal quotation marks omitted).

---

abandoned. Rule 5:27(d). Similarly, in assignment of error 213, Lawlor generally assigns error to the court's denial of his motion to suspend or vacate the final judgment but provides no argument relating to that motion. Therefore, to the extent this assignment of error is not encompassed by the others, it too is abandoned. Id.

The court clearly set forth its basis for denying Lawlor's motion:

> So, I have reviewed all of the evidence, all of the materials, the voluminous materials, the letters in support of you, the research articles submitted, and all of the other offered materials proffered in the presentations by your counsel in the sentencing phase.
>
> This was done despite the large quantity of material that was delivered only a few days ago.
>
> I have reviewed all of the Phase II litigation testimony of more than 50--I think the total is 51 witnesses presented by the defense at trial. I've considered the pre-sentence report as well as the statements you've made, the arguments of your attorneys, arguments of the Commonwealth.
>
> There simply has not been a document submitted on behalf of either the Commonwealth or the Defendant that has not been reviewed by the Court.
>
> The jury in this case was selected after a multi-week voir dire, and was selected and approved by both the Commonwealth and the Defendant as to composition of membership.
>
> Over a period of 31 trial days this jury heard the evidence in the guilt [or] innocence phase of this trial, including . . . your admission through counsel that you were the perpetrator of this horrific, vile, and unnecessarily cruel and vicious criminal act on Ginny Orange on September 24th, 2008.
>
> Thereafter, the jury found by a unanimous vote that you were guilty of the capital murder as alleged in both count one and count two.
>
> I have before me both Exhibit 1 and Exhibit 2 from the trial. Exhibit 1 is a picture of Ms. Orange in life and Exhibit 2 is a picture of Ms.

97

Orange in death.  Only discretion prevents me from showing those to you because there are citizens in the courtroom.

In Phase II of this trial, the jury was presented with and heard over 50 mitigation witnesses presented by the Defense in Phase II.

The jury thereafter deliberated for several days and they reviewed the evidence and the argument of both the Commonwealth and the Defendant.  The jury reached their unanimous verdict with the determination that under the facts of this case, the appropriate sentence under the law was the imposition of the death penalty for each of the two counts in the indictment.

I note that upon the reentry of the jury in to the court to deliver their verdict in Phase II, it was clear and obvious that the jury was, I guess the word is distraught, or better word, emotionally drained, and in fact several of the jurors were in tears.

It is clear evidence of the heavy emotional burden placed upon 12 citizens in a capital prosecution, and the seriousness and deliberation with which they addressed their civic duty as jurors.

There simply are no mitigating facts in this case that would convince the Court that the jury failed to properly consider any evidence in this litigation submitted by the defense.

There was abundant evidence and the jury's conclusion that the two crimes as charged contained both the presence of a continuing threat and a violence factor, which has not been discussed today at all in this hearing, and thus warranted punishment by the imposition of death.

Counsel argues that the Defendant has accepted responsibility and the Defendant has said that today.  Although I note for the record that over 22 months the defense position was

98

> that someone else had committed this act . . . .
> Even[] as late as December 9th of 2010, the
> defense was asking for funds to send an
> investigator to Uruguay to interview one Rafael
> Delgado, who they at least intimated was
> involved in this crime.
>
> It was only on January 13th in the opening
> statements that counsel for the Defendant
> accepted some responsibility.
>
> Mr. Lawlor, I find today, and it is a
> difficult finding, I will admit to you, no
> reason to intercede and sentence you contrary to
> the recommendations of the jury in either count
> one or count two.
>
> Today the Court affirms and imposes those
> sentences.

The record also indicates that the court prefaced its remarks by observing that Lawlor did not express remorse prior to sentencing. Lawlor points to a number of statements in which he expressed remorse, but these statements were contained in or attached as exhibits to a pleading filed on June 17, 2011, less than a week prior to the court's June 23 hearing. This 6-day interlude is a distinction without a difference for the purposes of reviewing the court's statement that "up until today, there has not been a scintilla of remorse," particularly when the court expressly noted that it had reviewed these statements when referring to "the large quantity of material that was delivered only a few days ago."

However, the record also indicates that the court considered Lawlor's pre-trial motions for funding to send an

investigator to Uruguay to interview and collect DNA from Delgado, whom Lawlor at the time asserted may have committed the murder as principal in the first degree.  In addition, the court commented that Lawlor "continued to deny [responsibility] for over 22 months of pretrial investigations, in motions, [and] pleadings by the defense team."  It also stated that he accepted responsibility "only on January 13th in the opening statements."

While it is proper for a court to consider a defendant's "present tense refusal to accept responsibility, or show remorse," Jennings v. State, 664 A.2d 903, 910 (Md. 1995) (emphasis added), it may not be linked to his "prior claim of innocence or not guilty plea or exercise of his right to remain silent."  Saenz v. State, 620 A.2d 401, 407 (Md. Ct. Spec. App. 1993).  See also Smith, 27 Va. App. at 362-63, 499 S.E.2d at 13-14 (citing Jennings and Saenz).  Lawlor's defense strategy in the 22 months preceding trial, including his assertion that Delgado may have committed the murder and the concomitant denial of responsibility it implied, was not an appropriate factor to consider in weighing Lawlor's sense of remorse at the time of sentencing.  Simply put, a defendant must not be penalized at sentencing for having mounted a legal defense to

the charge against him.[33]  See Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort.").

Nevertheless, the consideration under Code § 19.2-264.5 is whether there is good cause to set aside the jury's sentences of death; the court correctly noted that the question before it was whether to intercede and overrule the jury's determination. It is clear from the record that in evaluating that question the court considered and gave the greatest weight to the statutory sentencing report; the evidence adduced at trial, including Lawlor's mitigating evidence in the penalty phase; the duration of voir dire and the resulting impartiality of the jury; the seriousness with which jurors undertook and completed their deliberations; the jury's finding of both aggravating factors; and the egregiousness of the offense.  These are all proper factors for the court's consideration.  While Lawlor's defense strategy was not a proper factor, the court did not give it significant weight in relation to the many other factors stated from the bench when it determined that Lawlor had not shown good cause to set aside the jury's sentences.

---

[33] As noted, whether the defendant expresses remorse at sentencing is a proper factor for consideration and the trial court may weigh the credibility of any such expression, provided it does not consider the defendant's prior legal positions when doing so.

Accordingly, the court did not abuse its discretion in denying Lawlor's motion.  Landrum, 282 Va. at 352-53, 717 S.E.2d at 137.

CLAIM 15: NARROWING THE CLASS OF CAPITAL OFFENSES

This claim consists of a single assignment of error, assignment of error 20, in which Lawlor asserts that the circuit court erred by denying his motion to declare Code § 18.2-31 unconstitutional for failing to narrow the class of murders for which a sentence of death may be imposed.  He contends that the number of offenses defined as capital murder in the statute has increased to the point that it no longer satisfies the requirements of Gregg v. Georgia, 428 U.S. 153 (1976), Godfrey v. Georgia, 446 U.S. 420 (1980), and Zant v. Stephens, 462 U.S. 862 (1983).  We review this issue de novo. Gallagher, 284 Va. at 449, 732 S.E.2d at 24 (2012).

Lawlor's argument is without merit.  In Furman v. Georgia, 408 U.S. 238 (1972), the Supreme Court determined that arbitrary imposition of the death penalty was unconstitutional. States responded by narrowing the class of defendants on whom a sentence of death could be imposed.  For example, in Texas such a sentence could be imposed after conviction for one of only five categories of murder.  Jurek v. Texas, 428 U.S. 262, 268 (1976), overruled on other grounds by Abdul-Kabir, 550 U.S. at 258.  The Court determined that limiting the type of murder for

102

which a sentence of death could be imposed was sufficient for Furman purposes.  Jurek, 428 U.S. at 276.

By contrast, in Georgia every murder was punishable by either death or life imprisonment.  Gregg, 428 U.S. at 196. Nevertheless, that state narrowed the imposition of a sentence of death to those cases in which a jury found at least one of ten statutory aggravating factors beyond a reasonable doubt. The Court determined that requirement eliminated the opportunity the Furman jury had to impose a sentence of death arbitrarily, "without guidance or direction."  Id. at 196-97.

In Godfrey, the Court reiterated its holding in Gregg that "if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty."  446 U.S. at 428.  "It must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death."  Id. (internal quotation marks and footnotes omitted).

While the Court reversed the death sentence imposed in Godfrey, it did so because it determined that the sole aggravating factor upon which the sentence had been imposed had been applied unconstitutionally.  Id. at 432-33.  Notably, it did not reverse on the ground that Georgia law extended the

potential imposition of a sentence of death to too many

offenses. To the contrary, in Zant, the Supreme Court

reaffirmed the principle that appropriate aggravating factors

may be sufficient to narrow the class of defendants upon whom a

sentence of death may be imposed. 462 U.S. at 878-79.

In short, states may avoid the arbitrary imposition of the

death penalty either by restricting the types of murder

constituting capital offenses or by setting forth aggravating

factors which must be proved prior to the imposition of a

sentence of death. By specifying certain offenses as capital

murder in Code § 18.2-31 and setting forth aggravating factors

in Code §§ 19.2-264.2 and 19.2-264.4(C), Virginia has done

both. Accordingly, the statutory aggravating factors set forth

in Code §§ 19.2-264.2 and 19.2-264.4(C) satisfy the

constitutional obligation to narrow the cases in which a

sentence of death may be imposed regardless of the number of

offenses defined as capital murder in Code § 18.2-31. The

court therefore did not err in denying Lawlor's motion.

CLAIM 16: CRUEL AND UNUSUAL PUNISHMENT

This claim consists of a single assignment of error,

assignment of error 204, in which Lawlor asserts that the

circuit court erred by denying his motion to bar the imposition

of a sentence of death because both of the Commonwealth's

methods of execution constitute cruel and unusual punishment.

He also argues that an evidentiary hearing was necessary to ascertain the changes made to its lethal injection protocol since our last review.

Code § 53.1-234 allows a prisoner who has been sentenced to death to elect whether the sentence will be executed by electrocution or lethal injection; if the prisoner fails to make a timely election, the statute directs that the sentence be executed by lethal injection.  We have consistently ruled that execution by electrocution is constitutionally permissible.  Porter, 276 Va. at 238, 661 S.E.2d at 432 (quoting Bell, 264 Va. at 203, 563 S.E.2d at 715-16); Orbe v. Johnson, 267 Va. 568, 570, 601 S.E.2d 543, 545 (2004) ("Orbe II").  When a prisoner sentenced to death may choose to have his sentence executed through a constitutionally permissible method, we will not consider a constitutional challenge to an alternative choice.  Porter, 276 Va. at 237, 661 S.E.2d at 432 ("When a condemned prisoner has a choice of method of execution, the inmate may not choose a method and then complain of its unconstitutionality, particularly when the constitutionality of the alternative method has been established.") (quoting Orbe II, 267 Va. at 570, 601 S.E.2d at 546).  Accordingly, we will not reverse the court's ruling.

CLAIM 17: LACK OF MEANINGFUL APPELLATE REVIEW

This claim consists of a single assignment of error, assignment of error 8, in which Lawlor asserts that the circuit court erred by denying his motion to declare the Commonwealth's capital punishment statutory scheme unconstitutional because it fails to provide defendants with an opportunity for meaningful appellate review. We have previously considered and rejected Lawlor's arguments. Morrisette v. Commonwealth, 264 Va. 386, 398, 569 S.E.2d 47, 55-56 (2002), cert. denied, 540 U.S. 1077 (2003); Bailey v. Commonwealth, 259 Va. 723, 742, 529 S.E.2d 570, 581, cert. denied, 531 U.S. 995 (2000). The circuit court did not err in adhering to our controlling precedents. We also find no reason to modify the views we previously expressed in them.

### III. REVIEW UNDER CODE § 17.1-313(C)

Code § 17.1-313(C) requires us to review every sentence of death and "consider and determine: [(1) w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and [(2) w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Lawlor presents his argument relating to this review in his eighteenth and final claim. While we consider Lawlor's arguments concomitantly with our statutory review, they do not restrict its scope. Code § 17.1-313(F).

106

A. PASSION, PREJUDICE, OR OTHER ARBITRARY FACTORS

In assignment of error 214, Lawlor asserts that the sentences of death were imposed under the influence of prejudice and an arbitrary factor, i.e., mistake. In particular, he cites the trial court's references to his decision not to testify and his counsel's advocacy. He also argues that the jury's sentences were made without the evidence of his remorse and his asserted lack of risk of future dangerousness excluded by the court's rulings.

We have addressed each of these arguments above and have found no reversible error. In addition, we have reviewed the errors Lawlor assigns to the judgment of the trial court to ascertain whether they suggest prejudice when considered cumulatively. See Porter, 276 Va. at 266, 661 S.E.2d at 448 (citing Waye v. Commonwealth, 219 Va. 683, 704, 251 S.E.2d 202, 214 (1979)). We conclude that they do not.

Expanding our review beyond the scope of Lawlor's argument, we have thoroughly reviewed the record as mandated by Code § 17.1-313(C)(1). Nothing therein suggests that the jury failed to consider fully all evidence adduced in both the guilt and penalty phases of trial, including Lawlor's relevant mitigating evidence. Likewise, nothing suggests any improper influence in imposing the sentences of death. Accordingly, we conclude that there is no indication that the sentences were

107

imposed under the influence of passion, prejudice, or any other arbitrary factor.

## B. EXCESSIVE OR DISPROPORTIONATE SENTENCE

In assignment of error 215, Lawlor asserts that, although his crime was terrible, it does not compare to those this Court routinely sees in capital cases. However, that is not the standard set forth in the statute. Rather, we "determine whether other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant." Morva, 278 Va. at 354, 683 S.E.2d at 567 (quoting Lovitt, 260 Va. at 518, 537 S.E.2d at 880) (internal quotation marks omitted). "This review is not designed to ensure complete symmetry among all death penalty cases. Rather, the goal of the review is to determine if a sentence of death is aberrant." Prieto II, 283 Va. at 188-89, 721 S.E.2d at 507-08 (quoting Porter, 276 Va. at 267, 661 S.E.2d at 448 (internal citation, alteration, and quotation marks omitted).

Pursuant to Code § 17.1-313(C)(2) and (E), we examined similar cases in which a sentence of death was imposed following a conviction for capital murder in the commission of abduction with intent to defile or a conviction for capital murder in the commission of or subsequent to rape or attempted rape. Our review was especially attentive to those cases in

which both aggravating factors were found, including Vinson v. Commonwealth, 258 Va. 459, 522 S.E.2d 170 (1999), cert. denied, 530 U.S. 1218 (2000), Prieto II, and the cases cited therein.

Barnabei v. Commonwealth, 252 Va. 161, 477 S.E.2d 270 (1996), cert. denied, 520 U.S. 1224 (1997), and Payne v. Commonwealth, 257 Va. 216, 509 S.E.2d 293 (1999), are particularly analogous in that they each involve victims of rape or attempted rape who suffered multiple blows from blunt objects. Swisher v. Commonwealth, 256 Va. 471, 506 S.E.2d 763 (1998), cert. denied, 528 U.S. 812 (1999), is similarly noteworthy in that both capital murder in the commission of abduction with intent to defile and capital murder in the commission of rape were charged in that case as they were in Lawlor's.

We also reviewed capital murder cases in which a sentence of life imprisonment was imposed. Based on the totality of this review, we find that the sentences of death imposed in this case were not excessive or disproportionate to sentences imposed in capital murder cases for comparable crimes.

IV. CONCLUSION

We find no error in the judgment of the circuit court. Accordingly, we affirm the convictions for capital murder and the sentences of death returned by the jury and the judgment entered by the court.

Affirmed.